**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION** | **Case No. 14-MD-01720 (JG) (JO)** |
| | **ORAL ARGUMENT REQUESTED** |
| **This Document Applies to:** **All Opt-Out Cases.** | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF**
**THEIR MOTION TO DISMISS THE OPT-OUT COMPLAINTS**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................... iii

PRELIMINARY STATEMENT ...................................................................... 1

PROCEDURAL BACKGROUND .................................................................. 2

A.       The *Visa Check* Class Settlements and Releases ................................. 3

B.       The Prior Proceedings in MDL 1720 .................................................. 4

       1.       The Motions to Dismiss the
                 Claims of the Class Merchants .......................................... 4

       2.       The Settlement with the Class Merchants ........................... 5

       3.       The Opt-Outs' Claims ...................................................... 6

ARGUMENT ................................................................................................. 7

I.       THE *VISA CHECK* CLASS SETTLEMENT
       RELEASES BAR THE OPT-OUTS' CLAIMS ................................. 8

       A.       This Court Already Has Held That the Releases Bar
                 Claims for Damages Incurred Before January 1, 2004 ...................................... 9

       B.       The Releases Also Bar the Opt-Outs' Claims
                 for Damages Incurred Since January 1, 2004 .................................... 9

II.      *ILLINOIS BRICK* BARS THE OPT-OUTS'
       CLAIMS UNDER FEDERAL ANTITRUST LAW .................................. 13

       A.       The Opt-Outs Do Not and Cannot Allege That They
                 Are Direct Payors of Allegedly Inflated Interchange Fees ................................. 13

       B.       *Illinois Brick* Bars the Opt-Outs' Claims as
                 Indirect Payors of Allegedly Inflated Interchange Fees ..................................... 15

       C.       The Opt-Outs Allege No Facts That Could
                 Establish Any Exception to *Illinois Brick* ....................................... 18

Page

III.   *BUFFALO BROADCASTING* AND RELATED CASES BAR
       THE OPT-OUTS' SHERMAN ACT § 1 CLAIMS BASED ON
       VISA AND MASTERCARD DEFAULT INTERCHANGE RULES .......................... 21

       A.     The Opt-Outs Do Not Allege That the Visa
              or MasterCard Network Default Interchange
              Rules Restrain Banks' Freedom to Compete ....................................... 21

       B.     Under *Buffalo Broadcasting* and Related Cases,
              Network Rules That Do Not Limit Participants'
              Freedom to Compete Do Not Restrain Trade ..................................... 23

IV.    THE VISA AND MASTERCARD IPOS
       BAR THE OPT-OUTS' SHERMAN ACT § 1
       CLAIMS FOR THE PERIOD SINCE EACH IPO ........................................ 26

       A.     The Opt-Outs Acknowledge That the IPOs Made Visa
              and MasterCard Publicly Owned Companies, Ending
              Their Asserted "Structural" Conspiracies With Banks ..................................... 27

       B.     The Opt-Outs Plead No Facts That Could
              Show a Horizontal Conspiracy Among
              Banks and Visa or MasterCard After the IPOs .................................... 28

              1.     The Opt-Outs Plead No Post-IPO
                     "Structural" Conspiracy ........................................................ 29

              2.     The Opt-Outs Plead No Post-IPO
                     "Hub and Spoke" Conspiracy ................................................. 30

              3.     The Opt-Outs Plead No Post-IPO
                     Conspiracy Under *American Needle* ....................................... 33

       C.     The Opt-Outs Plead No Facts That Could
              Show a Vertical Conspiracy Between Each
              Bank and Visa or MasterCard After the IPOs .................................... 34

V.     THE OPT-OUTS' CLAIMS BASED ON DEBIT INTERCHANGE
       FEES ARE BARRED FOR THE PERIOD AFTER THOSE
       FEES BECAME SUBJECT TO FEDERAL REGULATION ....................................... 36

CONCLUSION .................................................................................................. 39

## TABLE OF AUTHORITIES

Page

**Cases**

AD/SAT, A Division of Skylight, Inc. v. Associated Press,
    181 F.3d 216 (2d Cir. 1999) ........................................................ 35

American Airlines v. Christensen,
    967 F.2d 410 (10th Cir. 1992) .................................................... 35

American Needle, Inc. v. National Football League,
    560 U.S. 138 (2010) ................................................................. 33-34

Arizona v. Shamrock Foods Co.,
    729 F.2d 1208 (9th Cir. 1984) .................................................... 20

Ashcroft v. Iqbal,
    556 U.S. 662 (2009) ..................................................................... 7

Bell Atlantic Corp. v. Twombly,
    550 U.S. 544 (2007) ................................................... 7, 27, 29, 30

Blue Tree Hotels Investment (Canada), Ltd. v. Starwood Hotels &
    Resorts Worldwide, Inc., 369 F.3d 212 (2d Cir. 2004) ......................... 3

Broadcast Music, Inc. v. Columbia Broadcasting System, Inc.,
    441 U.S. 1, 21-22 (1979) ........................................................... 25

Buffalo Broadcasting Co. v. American Society of Composers, Authors and Publishers,
    744 F.2d 917 (2d Cir. 1984) ............................................ 2, 21, 23-25

CBC Companies, Inc. v. Equifax, Inc.,
    561 F.3d 569 (6th Cir. 2009) .................................................... 38-39

City of Pittsburgh v. West Penn Power Co.,
    147 F.3d 256 (3d Cir. 1998) ...................................................... 39

Columbia Broadcasting System, Inc. v. American Society of Composers, Authors
    and Publishers, 620 F.2d 930 (2d Cir. 1980) ................................... 21

Continental Airlines, Inc. v. United Airlines, Inc.,
    277 F.3d 499 (4th Cir. 2002) ..................................................... 25

Copperweld Corp. v. Independence Tube Corp.,
    467 U.S. 752, 769 (1984) .......................................................... 33

Page

*Dickson v. Microsoft Corp.,*
309 F.3d 193 (4th Cir. 2002) ............................................. 20

*Federal Paper Board Co., Inc. v. Amata,*
693 F. Supp. 1376 (D. Conn. 1988) .................................... 25

*Freeman v. San Diego Association of Realtors,*
322 F.3d 1133 (9th Cir. 2003) ........................................... 19

*Hanover Shoe, Inc. v. United Shoe Machinery Corp.,*
392 U.S. 481 (1968) ........................................................ 15

*Hirsch v. Arthur Andersen & Co.,*
72 F.3d 1085 (2d Cir. 1995) ............................................... 7

*Howard Hess Dental Laboratories, Inc. v. Dentsply International, Inc.,*
602 F.3d 237 (3d Cir. 2010) ............................................. 36

*Hunter Douglas, Inc. v. Comfortex Corp.,*
1999 U.S. Dist. LEXIS 10906 (N.D.N.Y. Mar. 11, 1999) .................... 12

*Illinois Brick Co. v. Illinois,*
431 U.S. 720 (1977) .................................................... *passim*

*In re ATM Fee Antitrust Litigation,*
686 F.3d 741 (9th Cir. 2012) ...................................... 17, 20-

*In re Canadian Import Antitrust Litigation,*
470 F.3d 785 (8th Cir. 2006) ........................................... 38

*In re Elevator Antitrust Litigation,*
502 F.3d 47 (2d Cir. 2007) ........................................... 27, 30

*In re Insurance Brokerage Antitrust Litigation,*
618 F.3d 300 (3d Cir. 2010) ........................................... 31

*In re Literary Works in Electronic Databases Copyright Litigation,*
654 F.3d 242 (2d Cir. 2011) ........................................... 10

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation,*
2008 WL 115104 (E.D.N.Y. Jan. 8, 2008) .................. 4-5, 8, 9, 10-11

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation,*
2008 WL 5082872 (E.D.N.Y. Nov. 25, 2008) ............................ 5, 28

Page

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*,
— F. Supp. 2d —, 2013 WL 6510737 (E.D.N.Y. Dec. 13, 2013) ................................. *passim*

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*,
— F. Supp. 2d —, 2014 WL 92465 (E.D.N.Y. Jan. 14, 2014) ............................... 30

*In re Visa Check/MasterMoney Antitrust Litigation*,
192 F.R.D. 68 (E.D.N.Y. 2000),
*aff'd*, 280 F.3d 124 (2d Cir. 2001) .............................................................. 3, 13-14

*In re Visa Check/MasterMoney Antitrust Litigation*,
297 F. Supp. 2d 503 (E.D.N.Y. 2003),
*aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
396 F.3d 96 (2d Cir. 2005) .......................................................... 3-4, 14

*Kansas v. Utilicorp United, Inc.*,
497 U.S. 199 (1990) ................................................................... 18, 19

*Kendall v. Visa U.S.A., Inc.*,
518 F.3d 1042 (9th Cir. 2008) ................................................... 17, 20 ,31

*Kramer v. Time Warner Inc.*,
937 F.2d 767 (2d Cir. 1992) ........................................................... 3

*Madison Square Garden, L.P. v. National Hockey League*,
2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008) ............................... 11-12

*Matsushita Electrical Industrial Co. v. Cinram International, Inc.*,
299 F. Supp. 2d 370 (D. Del. 2004) ........................................... 25

*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986) .................................................................... 35

*Mayor and City Council of Baltimore v. Citigroup., Inc.*,
709 F.3d 129 (2d Cir. 2013) ................................................ 7, 27, 30

*MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc.*,
161 F.3d 443 (7th Cir. 1998) ........................................................ 12

*Monsanto Co. v. Spray-Rite Service Corp.*,
465 U.S. 752 (1984) .................................................................... 35

*National ATM Council, Inc. v. Visa Inc.*,
922 F. Supp. 2d 73 (D.D.C. 2012), *appeal pending* ................................. 28, 32, 34

Page

*National ATM Council, Inc. v. Visa Inc.,*
— F. Supp. 2d —, 2013 WL 6671660 (D.D.C. Dec. 19, 2013),
*appeal pending* .......................................................................................... 28, 31, 32

*National Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.,*
596 F. Supp. 1231 (S.D. Fla. 1984),
*aff'd*, 779 F.2d 592 (11th Cir. 1986) ................................................. 14, 19, 26, 30

*Paycom Billing Services, Inc. v. MasterCard International, Inc.,*
467 F.3d 283 (2d Cir. 2006) ......................................................... 13, 16-17, 25-26

*PepsiCo, Inc. v. Coca-Cola Co.,*
315 F.3d 101 (2d Cir. 2002) ................................................................................ 32

*PSKS, Inc. v. Leegin Creative Leather Products, Inc.,*
615 F.3d 412 (5th Cir. 2010) ............................................................................... 31

*Record Club of America, Inc. v. United Artists Records, Inc.,*
611 F. Supp. 211 (S.D.N.Y. 1985) ...................................................................... 12

*Royal Printing Co. v. Kimberly-Clark Corp.,*
621 F.2d 323 (9th Cir. 1980) ............................................................................... 19

*Shane v. Humana, Inc.,*
2009 WL 7848518 (S.D. Fla. Nov. 5, 2009),
*adopted*, 2009 WL 7848638 (S.D. Fla. Dec. 1, 2009) ........................................ 12

*Simon v. KeySpan Corp.,*
694 F.3d 196 (2d Cir. 2012) ..................................................................... 13, 37, 38

*Smith v. Dada Entertainment, LLC,*
2012 WL 4711414 (S.D.N.Y. Sept. 27, 2012) ................................................ 8, 12

*Square D Co. v. Niagara Frontier Tariff Bureau Inc.,*
476 U.S. 409 (1986) ........................................................................................ 37-38

*Temple v. Circuit City Stores, Inc.,*
2007 WL 2790154 (E.D.N.Y. Sept. 25, 2007) .................................................... 16

*Toscano v. Professional Golfers' Association,*
258 F.3d 978 (9th Cir. 2001) ............................................................................... 35

*United States v. Visa U.S.A. Inc.,*
163 F. Supp. 2d 322 (S.D.N.Y. 2001),
*aff'd*, 344 F.3d 229 (2d Cir. 2003) ................................................................. 14, 23

Page

*Visa U.S.A. Inc. v. First Data Corp.*,
　　2006 WL 1310448 (N.D. Cal. May 12, 2006) ............................................... 19-20

*VKK Corp. v. National Football League*,
　　244 F.3d 114 (2d Cir. 2001) ........................................................................ 10, 11

*Willsea v. Theis*,
　　1999 WL 595629 (S.D.N.Y. Aug. 6, 1999) ..................................................... 8, 12

**Statutes and Rules**

12 Code of Federal Regulations 235.3 ........................................................... 37, 38

12 Code of Federal Regulations 235.4 ................................................................ 37

15 U.S.C. § 1693o–2 ................................................................................. 2, 37, 38

Clayton Act § 4, 15 U.S.C. § 15 ......................................................................... 16

Dodd-Frank Wall Street Reform and Consumer Protection Act,
　　Pub. L. No. 111-203, 124 Stat. 1376, 2068-2074 (2010) ................................. 37

Federal Rule of Civil Procedure 12(b)(6) .............................................................. 7

Final Rule, Debit Card and Interchange Fees and Routing,
　　76 Fed. Reg. 43,394 (July 20, 2011) .............................................................. 37

Sherman Act § 1, 15 U.S.C. § 1 ................................................................. *passim*

## PRELIMINARY STATEMENT

Defendants Visa Inc., Visa U.S.A. Inc., and Visa International Service Association ("Visa"), and defendants MasterCard Incorporated and MasterCard International Incorporated ("MasterCard"), submit this memorandum in support of their motion to dismiss the claims in all of the opt-outs' complaints in this litigation ("MDL 1720" or "*Payment Card*").  The defendant banks also join in the motion and this memorandum with respect to the opt-out complaints in which they are named as defendants.[1]

The class settlement in MDL 1720 allowed merchants to opt out of the Rule 23(b)(3) Settlement Class to assert claims for damages incurred before November 27, 2012.  The opt-outs' antitrust complaints now before this Court fail to state a claim for which damages could be recovered, for several independent reasons.

First, the opt-outs' claims are barred by the class settlement releases in *In re Visa Check/MasterMoney Antitrust Litigation*, 96-cv-05238 (E.D.N.Y.) (JG) (JO) ("*Visa Check*"). This Court previously held that those releases barred the MDL 1720 class merchants' claims for damages incurred before January 1, 2004.  That holding applies equally to the opt-outs' claims. Moreover, because the opt-outs' claims are based on Visa and MasterCard network rules in existence before January 1, 2004, the releases also bar the opt-outs' claims for damages incurred since January 1, 2004 that are based on those rules.

Second, the opt-outs' claims are barred by *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), which held that only direct payors of an alleged overcharge may recover antitrust

---

[1]  Two of the thirty-one opt-out complaints name banks as defendants.  The *7-Eleven* complaint names as defendants Bank of America Corporation, Bank of America, N.A., FIA Card Services, N.A., JPMorgan Chase & Co., Chase Bank U.S.A., N.A., Chase Paymentech Solutions, LLC, JPMorgan Chase Bank, N.A., Citigroup Inc., Citibank, N.A., Citicorp Payments Services, Inc., Wells Fargo & Company, and Wells Fargo Bank, N.A.  The *Buc-ee's* complaint names as defendants JPMorgan Chase & Co., Chase Bank U.S.A., N.A., JPMorgan Chase Bank, N.A., and Paymentech, LLC.

damages.  The opt-outs claim damages based on default interchange fees, which the opt-outs assert were inflated due to the challenged Visa and MasterCard network rules.  But those interchange fees were paid by acquiring entities to card-issuing banks, and the opt-outs do not and cannot allege facts showing that they paid interchange fees directly to card-issuing banks.  Nor do the opt-outs allege facts that could establish that any of the narrow exceptions to *Illinois Brick* applies to their claims.

Third, the opt-outs' Sherman Act § 1 claims based on the respective default interchange rules of Visa and MasterCard should be dismissed on an additional ground:  the opt-outs do not allege that those rules impair the freedom of banks to establish interchange fees different from the default fees.  The opt-outs thus fail to allege that default interchange rules restrain trade under *Buffalo Broadcasting Co. v. ASCAP*, 744 F.2d 917 (2d Cir. 1984), and related cases.

Fourth, the opt-outs' claims under Sherman Act § 1 should be dismissed for the period after the Visa and MasterCard IPOs.  Those claims are based on an asserted "structural" conspiracy among banks and Visa, or banks and MasterCard, to impose the challenged network rules.  But the opt-outs acknowledge that the IPOs made Visa and MasterCard publicly owned and operated corporations.  The IPOs thus eliminated the basis for any claimed "structural" conspiracy, and the opt-outs do not allege facts that could show banks conspired with Visa or MasterCard to determine the challenged network rules after the IPOs.

Finally, the opt-outs' claims based on debit interchange fees are barred for the period after those fees became subject to federal regulations promulgated under the Dodd-Frank Wall Street Reform and Consumer Protection Act, 15 U.S.C. § 1693o-2.

## PROCEDURAL BACKGROUND

The following procedural background is based on allegations in the opt-outs' complaints and documents that a court may properly consider in deciding a motion to dismiss, such as public

court filings and other documents of which judicial notice may be taken.  *See*, *e.g.*, *Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.*, 369 F.3d 212, 217 (2d Cir. 2004); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1992).

### A.   The *Visa Check* Class Settlements and Releases

In 1996, a putative class of merchants sued Visa and MasterCard in *Visa Check*.  The merchants asserted that Visa and MasterCard each violated the antitrust laws through their respective network payment acceptance rules, including their "honor all cards" and "default interchange" rules.  *See Visa Check*, 192 F.R.D. 68, 72-73 (E.D.N.Y. 2000) (Gleeson, J.), *aff'd*, 280 F.3d 124 (2d Cir. 2001).  Those rules allegedly resulted in merchants paying excessive fees for accepting consumers' Visa and MasterCard card payments.  *See* 192 F.R.D. at 72-73.

In 2003, Visa and MasterCard each entered into a settlement with a class of merchants that accepted their payment cards up to June 2003.  Visa and MasterCard agreed to pay the merchants a total of more than $3 billion and to modify their respective "honor all cards" rules and other network card acceptance rules.  *See Visa Check*, 2005 WL 6054267 [Visa Settlement] ¶¶ 1(c), 1(e), 3-9 and 2005 WL 6054266 [MasterCard Settlement] ¶¶ 1(c), 1(e), 3-9.

In return, the merchants provided releases to Visa, MasterCard, and banks that were member financial institutions of Visa or MasterCard.  The releases covered claims that a merchant "now has or hereafter can, shall or may have, relating in any way to any conduct prior to January 1, 2004 concerning any claims alleged in the Complaint," including "claims which have been asserted or could have been asserted in this litigation."  *Id.* at 2005 WL 6054267 [Visa Settlement] ¶¶ 1(t), 28 and 2005 WL 6054266 [MasterCard Settlement] ¶¶ 1(v), 30.

This Court granted final approval of the *Visa Check* class settlements.  *Visa Check*, 297 F. Supp. 2d 503, 508 (E.D.N.Y. 2003) (Gleeson, J.), *aff'd sub nom. Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96 (2d Cir. 2005).  The Court found that the settlement releases could

properly extend to claims that "arise from the same set of facts," specifically including claims that "interchange fees are artificially (and anticompetitively) high because of concerted activity of Visa and MasterCard." 297 F. Supp. 2d at 513. This Court concluded that "in exchange for an unprecedented amount of compensatory damages," the merchants "released all claims based on the mix of facts that produced anticompetitive intercha[n]ge rates." *Id.* at 514. On appeal, the Second Circuit affirmed. *See* 396 F.3d at 100-01, 106-07.

### B.   The Prior Proceedings in MDL 1720

Two years after the *Visa Check* settlements, merchants began filing new class actions against Visa, MasterCard, and banks, which were coordinated in this Court in MDL 1720. The class merchants again claimed that Visa and MasterCard violated antitrust laws through network "default interchange," "honor all cards," "no surcharge," "no discount," and other payment acceptance rules. *See*, *e.g.*, *Payment Card*, 04/24/2006 First Cons. Am. Class Action Compl. [Docket #317] ¶¶ 8(c), 8(l), 8(p), 124-76. The class merchants also again claimed that those network rules inflated default interchange fees and thereby increased the merchant discount fees that merchants paid to acquiring banks to accept Visa and MasterCard card payments. *See*, *e.g.*, *id.* ¶¶ 193-94.

### 1.   The Motions to Dismiss the Claims of the Class Merchants

Defendants moved to dismiss the class merchants' claims for damages incurred before January 1, 2004 as barred by the *Visa Check* class settlement releases. *See Payment Card*, 2008 WL 115104, at *1 (E.D.N.Y. Jan. 8, 2008) (Gleeson, J.).[2] This Court granted that motion, concluding that those claims fell "within the scope of the Settlement's release of claims relating

---

[2] In making that motion, defendants deferred for another day the question of whether those settlement releases also barred merchants' claims for damages incurred since January 1, 2004. *See Payment Card*, 06/09/2006 Memo. of Law in Support of Defs.' Mtn. to Dismiss [Docket #387] at 1-4 & n.1.

in any way to any conduct prior to January 1, 2004 concerning any claims alleged in the [*Visa Check*] Complaint." *Id*. at *11 (internal quotation omitted).

MasterCard also moved to dismiss the class merchants' claim that its IPO in 2006 violated federal antitrust law.  This Court granted that motion, noting that the merchants' allegations "demonstrate that the Banks do not retain sufficient control [post-IPO] to allow them, for example, to continue to impose supracompetitive interchange fees." *Payment Card*, 2008 WL 5082872, at *10 (E.D.N.Y. Nov. 25, 2008) (Gleeson, J.).

The class merchants subsequently amended their complaints and defendants again moved to dismiss.  Defendants sought dismissal of the class merchants' claims for damages incurred since January 1, 2004 based on the *Visa Check* releases, because the challenged network rules were in existence before January 1, 2004 and were part of the factual predicate released in *Visa Check*.  *See Payment Card*, 03/31/2009 Memo. of Law in Support of Mtn. to Dismiss [Docket #1172] at 4-11.  Defendants also moved to dismiss the claims based on Visa and MasterCard default interchange rules on the ground that those rules did not restrain trade under the principles of *Buffalo Broadcasting* and related cases.  *Id.* at 11-17.  Furthermore, defendants sought dismissal because the Visa and MasterCard IPOs cut off any potential liability for claims that the challenged network rules were the product of an antitrust conspiracy.  *Id.* at 30-36.

Defendants' motions to dismiss were briefed and argued, but the parties agreed to a class settlement before the Court ruled.  Accordingly, the Court deemed the motions withdrawn without prejudice to reinstatement.  *See Payment Card*, 07/17/2012 Docket Order.

## 2.       The Settlement with the Class Merchants

The class settlement in MDL 1720 provided for a Rule 23(b)(3) Settlement Class of merchants that accepted Visa or MasterCard cards from January 1, 2004 to the settlement preliminary approval date.  *See Payment Card*, 10/19/2012 Definitive Class Settlement

Agreement [Docket #1656-1] ¶ 2(a).  That class sought compensation for past damages, and opt-outs from the class were permitted.  *Id.* ¶¶ 2(a), 28-30.  The settlement also provided for a Rule 23(b)(2) Settlement Class of merchants that as of the settlement preliminary approval date accept, or in the future will accept, Visa or MasterCard cards.  *Id.* ¶ 2(b).  That class sought prospective modifications of Visa and MasterCard network rules, and opt-outs from it were not permitted.  *Id.* ¶¶ 2(b), 39-65.  The release provided by the Rule 23(b)(2) Settlement Class allowed merchants who opted out of the Rule 23(b)(3) Settlement Class to assert claims for damages incurred before the settlement preliminary approval date.  *See id.* ¶ 68.

This Court preliminarily approved the class settlement and certified the two settlement classes on November 27, 2012.  *See Payment Card*, 11/27/2012 Class Settlement Prelim. App'l Order [Docket #1745] ¶¶ 3, 5-6.  This Court subsequently granted final approval of the settlement and entered judgment.  *See Payment Card*, — F. Supp. 2d —, 2013 WL 6510737 (E.D.N.Y. Dec. 13, 2013) (Gleeson, J.) (final approval decision); *Payment Card*, 01/14/2014 Class Settlement Order and Final Judgment [Docket #6199].  Members of the Rule 23(b)(3) Settlement Class that opted out have filed the opt-out actions now pending before this Court.

### 3.    The Opt-Outs' Claims

The complaints filed by the merchant opt-outs in the *Target*, *7-Eleven*, and *Hawaiian* actions are representative of all of the opt-out complaints.  *See Target Corp. v. Visa Inc.*, No. 13-cv-05745 (E.D.N.Y.) (JG) (JO), 05/23/2013 Compl. [Docket #1] (the "*Target* Compl."); *7-Eleven, Inc. v. Visa Inc.*, No. 13-cv-05746 (E.D.N.Y.) (JG) (JO), 08/30/2013 Am. Compl. [Docket #8] (the "*7-Eleven* Compl."); *Hawaiian Holdings, Inc. v. Visa, Inc.*, No. 13-cv-06370 (E.D.N.Y.) (JG) (JO), 11/15/2013 Compl. [Docket #1] (the "*Hawaiian* Compl.").

The opt-outs' complaints challenge the same Visa and MasterCard network "default interchange," "honor all cards," "no surcharge," "no discount," and other payment acceptance

rules challenged by the class merchants.  *See Target* Compl. ¶¶ 6, 73-88; *7-Eleven* Compl.

¶¶ 5-6, 84, 88-90, 97, 101, 158-63; *Hawaiian* Compl. ¶¶ 1, 17(E)-(L).  The opt-outs also advance

the same theory that those network rules inflated interchange fees, and thereby the fees that

merchants paid for accepting consumers' Visa and MasterCard card payments.  *See Target*

Compl. ¶¶ 6, 112-14; *7-Eleven* Compl. ¶¶ 89, 177-78; *Hawaiian* Compl. ¶¶ 1, 19-20.  Based on

those allegations, the opt-outs assert claims under Sherman Act § 1, and some opt-outs also

assert claims under Sherman Act § 2 and state antitrust or unfair competition statutes.  *See*

*Target* Compl. ¶¶ 132-77; *7-Eleven* Compl. ¶¶ 200-94; *Hawaiian* Compl. ¶¶ 53-171.

## ARGUMENT

Pursuant to Federal Rule of Civil Procedure 12(b)(6), a court should grant a motion to

dismiss when a plaintiff fails "to state a claim upon which relief can be granted."  "To survive a

motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a

claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

(quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  That standard requires the

plaintiff to plead "factual content that allows a court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."  *Ashcroft*, 556 U.S. at 678.

In analyzing whether a plaintiff has pled sufficient facts, a court should not accept as true

"legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action, supported by

mere conclusory statements."  *Id.*  A court should "give no effect at all to legal conclusions

couched as factual allegations."  *Mayor & City Council of Baltimore v. Citigroup, Inc.*, 709 F.3d

129, 135 (2d Cir. 2013) (internal quotation omitted).  Moreover, generalized allegations "need

not be credited . . . when they are belied by more specific allegations of the complaint."  *Hirsch*

*v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995).

I.      **THE *VISA CHECK* CLASS SETTLEMENT**
        **RELEASES BAR THE OPT-OUTS' CLAIMS**

As this Court and other courts have recognized, a motion to dismiss may properly be

based on a prior settlement release.  *See*, *e.g.*, *Payment Card*, 2008 WL 115104, at *8 (noting

that settlement agreements "fall well within the range of materials that a court may consider on a

motion to dismiss"); *Smith v. Dada Entm't, LLC*, 2012 WL 4711414, at *2 n.1, *6-7 (S.D.N.Y.

Sept. 27, 2012) (same); *Willsea v. Theis*, 1999 WL 595629, at *11-12 (S.D.N.Y. Aug. 6, 1999)

(same).  Here, all the opt-outs' claims, under both federal and state law, should be dismissed

because they are barred by the *Visa Check* class settlement releases.

Those releases cover all past, present, and future claims relating "in any way" to any

conduct that was in existence prior to January 1, 2004 — including the Visa and MasterCard

network rules in existence by that date —— and that pertained to the claims alleged or that could

have been alleged in *Visa Check*.  Specifically, the releases extend to:

> all manner of claims, demands, actions, suits, causes of action . . . whether
> class, individual, or otherwise in nature, damages whenever incurred,
> liabilities of any nature whatsoever, including costs, expenses, penalties
> and attorneys' fees, known or unknown, suspected or unsuspected, in law
> or equity, that any [merchant class member] ever had, ***now has or***
> ***hereafter can, shall or may have, relating in any way to any conduct prior***
> ***to January 1, 2004 concerning any claims alleged in the Complaint*** or
> any of the complaints consolidated therein, ***including, without limitation,***
> ***claims which have been asserted or could have been asserted in this***
> ***litigation*** which arise under or relate to any federal or state antitrust, unfair
> competition, unfair practices, or other law or regulation, or common law,
> including, without limitation, the Sherman Act, 15 U.S.C. § 1 et seq.

*Visa Check*, 2005 WL 6054267 [Visa Settlement] ¶ 28 and 2005 WL 6054266 [MasterCard

Settlement] ¶ 30 (emphasis added).  Included within that released conduct was the very same set

of Visa and MasterCard network rules that the opt-outs now seek to challenge once again in their

current complaints.

**A.    This Court Already Has Held That the Releases Bar
Claims for Damages Incurred Before January 1, 2004**

To the extent that the opt-outs seek damages incurred before January 1, 2004, this Court

already has held that those claims are barred by the *Visa Check* releases.[3]  In finding the class

merchants' claims for damages incurred before January 1, 2004 were released, this Court

concluded that "[t]he factual allegations on which those complaints are predicated plainly relate

to the factual predicate of the *Visa Check* litigation, which included the nature and extent of

defendants' collaboration, the effect of any such collaboration on competition and interchange

fees, and the resulting harm to merchants."  *Payment Card*, 2008 WL 115104, at *11.

The opt-outs' complaints are predicated on similar factual allegations and challenge the

same Visa and MasterCard network rules as the class merchants' complaints.  *Compare*, *e.g.*,

*Target* Compl. ¶¶ 6, 73-88, 112-14; *7-Eleven* Compl. ¶¶ 5-6, 84, 88-90, 97, 101, 158-63, 177-78;

*Hawaiian* Compl. ¶¶ 1, 17(E)-(L), 19-20; *with* 04/24/2006 First Cons. Am. Class Action Compl.

[Docket #317] ¶¶ 8(c), 8(l), 8(p), 124-76.  Any claims by the opt-outs for damages incurred

before January 1, 2004 should be dismissed for the same reasons that this Court dismissed the

class merchants' similar claims.

**B.    The Releases Also Bar the Opt-Outs' Claims
for Damages Incurred Since January 1, 2004**

The *Visa Check* releases also bar the opt-outs' claims for damages incurred since

January 1, 2004, because those claims relate to the same Visa and MasterCard network rules

established prior to January 1, 2004.  This Court recognized that those network rules "plainly

relate to the factual predicate of the *Visa Check* litigation" because they were in existence prior

---

[3]  None of the opt-outs specifically claims damages incurred before January 1, 2004, but many opt-outs
do not limit their claims to damages incurred since January 1, 2004.  *See*, *e.g.*, *Target* Compl. page 54
(prayer for relief not limiting the time period for which damages are sought).

to January 1, 2004.  *Payment Card*, 2008 WL 115104, at *11.  And the *Visa Check* releases

specifically cover all claims that a merchant "ever had, now has or *hereafter can, shall or may*

*have, relating in any way to any conduct prior to January 1, 2004* concerning any claims alleged

in the Complaint."  *Visa Check*, 2005 WL 6054267 [Visa Settlement] ¶ 28 and 2005 WL

6054266 [MasterCard Settlement] ¶ 30 (emphasis added).

　　　As the Second Circuit has noted:  "It is not uncommon . . . for a release to prevent the

releasor from bringing suit against the releasee for engaging in a conspiracy that is later alleged

to have continued after the release's execution."  *VKK Corp. v. Nat'l Football League*, 244 F.3d

114, 126 (2d Cir. 2001).  In *In re Literary Works in Electronic Databases Copyright Litigation*,

654 F.3d 242 (2d Cir. 2011), the Second Circuit recently confirmed that a class settlement may

properly release claims based on continuing conduct.  There, a settling class of freelance authors

complained that publishers had engaged in copyright infringement, and objectors argued that the

class settlement improperly released future damages claims arising from the subsequent use of

the authors' works.  *See id.* at 247-48.  The Second Circuit rejected that argument, holding that

"regardless of whether future infringements would be considered independent injuries, the

[s]ettlement's release of claims regarding future infringements is not improper."  *Id.* at 248; *see*

*also*, *e.g.*, *id.* at 249 ("the [s]ettlement's release pertaining to future uses by publishers and their

sublicensees was permissible").  There is no difference in principle between a release of future

claims based on allegedly continuing copyright violations, as in *In re Literary Works*, and a

release of future claims based on allegedly continuing antitrust violations, as in *Visa Check*.

　　　Thus, the question here is whether the *Visa Check* releases encompass future claims

pertaining to Visa and MasterCard network rules that were previously established.  And the

releases do encompass those claims because they expressly cover not only damages incurred

before January 1, 2004, but also claims that the releasing merchants "hereafter can, shall or may

have" in the future that relate "in any way" to "any conduct prior to January 1, 2004." Here, the opt-outs assert future claims that relate "in any way" to the challenged Visa and MasterCard network rules that were in existence prior to January 1, 2004, so those claims are barred by the *Visa Check* releases.

The court in *Madison Square Garden, L.P. v. National Hockey League*, 2008 WL 4547518 (S.D.N.Y. Oct. 10, 2008), reached the same conclusion in analyzing similar release language. There, Madison Square Garden had released the NHL from all liability for acts "occurring at any time up to and including the date of the execution of" their agreement, and "relating to, or arising from, any hockey operations or any NHL activity." *Id.* at *5. Madison Square Garden then argued that it could prosecute antitrust claims based on continuing NHL activities because they were "current conduct, not historical conduct," and the release would violate "public policy" it if "operate[d] as a prospective waiver of the right to sue for subsequent antitrust violations." *Id.* at *6.

The court rejected those arguments. It concluded that the release barred Madison Square Garden's claims "[b]ecause this very antitrust claim exist[ed] at the time of the release, and because the only allegations in the Complaint demonstrate that the League *continued* its enforcement of pre-existing policies." *Id.* (internal quotations omitted). The court also concluded that "well-settled principles favor[] settlement as a matter of public policy" and that the Second Circuit had supported "the enforceability . . . of releases of 'conspiracies alleged to continue post-release.'" *Id.* at *8 (quoting *VKK*, 244 F.3d at 126). Moreover, the court found "considerable support in the caselaw for the distinction . . . that the public policy considerations differ when the only 'prospective' application of the release in question is the continued adherence to a pre-release restraint," as opposed to "truly new and distinctive incidents" or

11

"subsequent conduct . . . that goes beyond what was released in the first instance." *Id.* at *8-9 (internal quotation omitted).[4]

Other courts in the Second Circuit have reached the same conclusion. *See, e.g.*, *Smith*, 2012 WL 4711414, at *6 (class member could not relitigate "whether the charges that were the subject matter of the previous lawsuit [settled in 2009], even those that continued to accrue after January 7, 2010, were fraudulently billed"); *Willsea*, 1999 WL 595629, at *12 (characterizing as "nonsense" the argument that a release did not bar the releasing party's post-settlement claims "equally available" in his settled action); *Hunter Douglas, Inc. v. Comfortex Corp.*, 1999 U.S. Dist. LEXIS 10906, at *21 (N.D.N.Y. Mar. 11, 1999) (release barred a claim challenging ongoing practices that had "not been altered materially since the parties executed" a release); *Record Club of Am., Inc. v. United Artists Records, Inc.*, 611 F. Supp. 211, 217 n.8 (S.D.N.Y. 1985) (release barred antitrust claim for "conduct extending past the date of the release"). Courts in other circuits have reached the same conclusion.[5]

Here, the opt-outs — like the class merchants — challenge Visa and MasterCard network rules that this Court already has found were in existence prior to January 1, 2004 and part of the factual predicate of the *Visa Check* case that was released. The *Visa Check* releases thus bar the opt-outs' claims predicated on those rules not only for damages incurred before January 1, 2004, but also for damages incurred since January 1, 2004.

---

[4]  This Court, in granting final approval of the class settlement in MDL 1720, similarly recognized that because the illegality of the challenged network rules "is at minimum an unsettled question, future challenges to them could properly be released," but noted that the release does not extend to "claims based on new rules or new conduct." *Payment Card*, 2013 WL 6510737, at *22.

[5]  *See, e.g.*, *MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc.*, 161 F.3d 443, 448 (7th Cir. 1998) (where the defendants' post-release refusal to deal with the plaintiff was based on "continued adherence" to a pre-release agreement, "this claim is clearly based on pre-[release] conduct and, as such, is expressly barred by the [r]elease"); *Shane v. Humana, Inc.*, 2009 WL 7848518, at *4-9 (S.D. Fla. Nov. 5, 2009) (enjoining plaintiffs from prosecuting claims based on alleged antitrust conspiracy that originated before final approval of class settlement), *adopted*, 2009 WL 7848638 (S.D. Fla. Dec. 1, 2009).

## II.   *ILLINOIS BRICK* BARS THE OPT-OUTS' <br> CLAIMS UNDER FEDERAL ANTITRUST LAW

*Illinois Brick* requires that a plaintiff's claim for antitrust damages be dismissed when the plaintiff fails to allege that it is the direct payor of an alleged overcharge.  *See*, *e.g.*, *Simon v. KeySpan Corp.*, 694 F.3d 196, 201-04 (2d Cir. 2012) (affirming dismissal of indirect purchaser claims); *Paycom Billing Servs., Inc. v. MasterCard Int'l, Inc.*, 467 F.3d 283, 291-92 (2d Cir. 2006) (affirming dismissal of claims of indirect payor of MasterCard network chargebacks). Here, the opt-outs do not and cannot allege facts showing that they paid directly to card-issuing banks the interchange fees allegedly inflated by the challenged Visa and MasterCard network rules.  Nor can the opt-outs allege facts showing that their claims fall within any exception to *Illinois Brick*.  Therefore, all the opt-outs' claims under federal antitrust law — under both Sherman Act § 1 and § 2 — should be dismissed.

### A.   The Opt-Outs Do Not and Cannot Allege That They <br> Are Direct Payors of Allegedly Inflated Interchange Fees

This Court and other courts uniformly have concluded that in the Visa and MasterCard networks, default interchange is a fee that the bank that acquires a merchant's Visa or MasterCard transaction pays to the bank that issued the Visa or MasterCard card used in the transaction.  For example, in its decision granting final approval of the class settlement, this Court stated that "[t]he issuing bank . . . transmits to the acquiring bank the amount of the purchase price minus the 'interchange fee.'"  *Payment Card*, 2013 WL 6510737, at *1.  In *Visa Check*, this Court likewise adopted the allegations of the class merchants and their counsel — some of whom assert claims in the opt-out cases — that the "interchange fee" is "the fee that the acquiring institution pays the card-issuing institution every time it processes a payment by one of the card-issuing institution's cardholders at one of the acquiring institution's retailers."  *Visa Check*, 192 F.R.D. at 72, *aff'd*, 280 F.3d at 130 ("the acquiring institution pays the card-issuing

institution an 'interchange fee'"); *accord Wal-Mart Stores*, 396 F.3d at 102 (the "interchange fee" is a "fee the acquiring institution must pay to the card-issuing institution").  Other courts have reached the same conclusion.[6]

The opt-outs cannot allege otherwise.  Indeed, the opt-outs' specific factual allegations confirm that they are at most indirect payors of interchange fees.  The opt-outs in *7-Eleven* acknowledge that the "Issuer directly deducts the Interchange Fee from the net transaction amount *passed through to the merchant*," and that the "deduction of Interchange Fees" is made "from the net transaction amount *received by the Acquirer*."  *7-Eleven* Compl. ¶¶ 105-06 (emphasis added).  The opt-outs in *Hawaiian* similarly allege that merchants "purchase General Purpose Credit Card Network Services . . . from Visa and MasterCard *through the Acquiring Bank members* of Visa and MasterCard," and specifically acknowledge that the Court may find that the opt-outs are *not* "'direct purchasers' under *Illinois Brick*."  *Hawaiian* Compl. ¶¶ 10, 104, 139 (emphasis added); *see also*, *e.g.*, *Siegel v. Visa U.S.A., Inc.*, No. 13-cv-04581 (E.D.N.Y.) (JG) (JO), 08/14/2103 Compl. [Docket #1] ¶¶ 32 ("the Issuing Bank pays the Acquiring Bank the amount of the transaction minus the interchange fee") and 33 (diagram showing same).

Some opt-outs make conclusory allegations that they "directly" pay interchange fees.  *7-Eleven* Compl. ¶¶ 93, 105, 176-77; *Hawaiian* Compl. ¶¶ 2-3, 26.  But the opt-outs allege no *facts* that could show that they, rather than the entities that acquire their Visa and MasterCard transactions, in fact pay interchange fees directly to card-issuing banks.  *See id.*  The most the opt-outs can muster is an allegation that "Issuers account for Interchange Fees as revenue" and

---

[6]  *See*, *e.g.*, *United States v. Visa U.S.A. Inc.*, 344 F.3d 229, 235 (2d Cir. 2003) ("[t]he issuer . . . pays the acquiring bank the amount requested, less what is called an 'interchange fee'"); *Nat'l Bancard Corp. (NaBanco) v. Visa U.S.A., Inc.*, 596 F. Supp. 1231, 1238 (S.D. Fla. 1984) ("the issuer bank withholds a small amount (called the 'interchange fee') from the monies due and owing the merchant bank to cover the costs of . . . processing"), *aff'd*, 779 F.2d 592, 593 (11th Cir. 1986).

"merchants account for Interchange Fees as an expense," whereas "Acquirers do not account for Interchange Fees as an expense." *7-Eleven* Compl. ¶ 105.  Allegations of how parties account for interchange fees, even if true, cannot establish that opt-outs paid interchange fees directly rather than indirectly through acquiring intermediaries that may choose to, but are not required to, "pass on" those fees in whole or in part.

> **B.    *Illinois Brick* Bars the Opt-Outs' Claims as <br> <u>Indirect Payors of Allegedly Inflated Interchange Fees</u>**

As indirect payors of allegedly inflated interchange fees, the opt-outs assert claims that are barred by *Illinois Brick*.  In *Illinois Brick*, the Supreme Court established a bright-line rule that a federal antitrust plaintiff may not seek damages for alleged overcharges that it did not pay directly, but that instead were passed on to it through an intermediary.  *See* 431 U.S. at 728-48. That rule is the reciprocal application of the Supreme Court's prior holding in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968), that an antitrust defendant may not avoid the payment of damages to a direct payor of alleged overcharges on the ground that the direct payor passed on those overcharges to others.

The Supreme Court in *Illinois Brick* concluded that indirect payors of overcharges should not be allowed to recover antitrust damages for two principal reasons.  First, the Supreme Court reasoned that "whatever rule is to be adopted concerning pass-on in antitrust damages actions, it must apply equally to plaintiffs and defendants."  431 U.S. at 728.  Because *Hanover Shoe* held that defendants may not use pass-on theories to avoid paying damages for the full overcharges to direct payors, allowing indirect payors to recover for passed on overcharges would "substantially increase[] the possibility of inconsistent adjudications and therefore of unwarranted multiple liability for the defendants by presuming that one plaintiff (the direct purchaser) is entitled to full recovery while preventing the defendant from using that presumption against the other plaintiff

[the indirect purchaser]." *Id.* at 730.  Second, the Supreme Court reiterated that "the overcharged direct purchaser, and not others in the chain of manufacture or distribution, is the party 'injured in his business or property' within the meaning of the [antitrust damages statute]." *Id.* at 729 (quoting 15 U.S.C. § 15).  The Supreme Court found that "the effectiveness of the antitrust treble-damages action would be substantially reduced by adopting a rule that any party in the chain may sue to recover the fraction of the overcharge allegedly absorbed by it." *Id.* at 729.

As this Court has noted, *Illinois Brick* "balanced the possibility of perfect compensation with the need for administrative efficiency, and concluded that it is better to sacrifice the former for the latter." *Temple v. Circuit City Stores, Inc.*, 2007 WL 2790154, at *6 (E.D.N.Y. Sept. 25, 2007) (Gleeson, J.).  *Illinois Brick* concluded that "[h]owever appealing an effort to allocate the overcharge might seem in theory, it would add a dimension of complexity to actions for antitrust damages that would seriously undermine their effectiveness." *Payment Card*, 2013 WL 6510737, at *12.

The Second Circuit has applied *Illinois Brick* to dismiss merchant claims against the MasterCard payment network.  In *Paycom*, the Second Circuit held that *Illinois Brick* barred an internet merchant (Paycom) from recovering damages for its claim that banks and MasterCard conspired to fix chargebacks that, like interchange fees, allegedly were levied by issuing banks against acquiring banks, and in turn passed on to merchants like Paycom.  *See* 467 F.3d at 291-92.  The Second Circuit reasoned that "the chargebacks and chargeback fines and penalties are imposed by issuing banks and MasterCard on acquiring banks.  Paycom is, therefore, in a position analogous to the indirect purchasers in *Illinois Brick*." *Id.* at 291.  The Second Circuit acknowledged that "the acquiring banks are alleged 'almost always' to pass-on these fees to the merchants," but held that "even if one hundred percent of the chargebacks, fines, and penalties

were passed-on, Paycom, as an indirect payor of the chargebacks and chargeback fines and penalties, would still lack antitrust standing" under *Illinois Brick*. *Id.* at 291-92.

Other courts have reached the same conclusion in rejecting antitrust challenges to network interchange fees. For example, in *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042 (9th Cir. 2008), the Ninth Circuit affirmed the dismissal of antitrust damages claims brought by merchants that, like the opt-outs here, sought damages based on allegations that banks conspired with Visa and with MasterCard to fix interchange fees. *Id.* at 1048-50. The Ninth Circuit held that because the merchants were not alleged to have been "charged the interchange fee directly," the merchants "run squarely into the *Illinois Brick* wall." *Id.* at 1049.

More recently, in a decision that this Court noted in its ruling granting final approval of the class settlement (*see Payment Card*, 2013 WL 6510737, at *13 n.15), the Ninth Circuit held that *Illinois Brick* barred bank customers from recovering damages based on interchange fees imposed on banks in ATM networks, and allegedly passed on in foreign ATM fees that banks charged to bank customers. *See In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 744, 748-50 (9th Cir. 2012). The Ninth Circuit reasoned that while the bank customers asserted "a conspiracy to set interchange fees, they fail[ed] to show a conspiracy to set [the] foreign ATM fees" that the bank customers paid. *Id.* at 751. Moreover, the Ninth Circuit rejected the argument that the banks fixed the interchange fees incorporated and "marked up" in the foreign ATM fees. The Ninth Circuit emphasized that "*Illinois Brick* rejected this argument" and that *Illinois Brick* requires that "the price paid by a plaintiff must be set by the conspiracy and not merely be affected by the setting of another price." *Id.* at 753-54.

The opt-outs here are in the same position as the merchants whose claims were dismissed in *Paycom* and *Kendall* and the bank customers in *In re ATM Fee*. The opt-outs do not and cannot allege facts establishing that they paid directly the interchange fees that acquiring entities

paid to card-issuing banks, and on which the opt-outs base their claims for damages from all of the challenged Visa and MasterCard network rules.  Certain opt-outs' allegations regarding banks' and merchants' accounting treatment of those fees are irrelevant, since the analysis in *Illinois Brick* did not turn on the parties' accounting practices, but on whether alleged overcharges are paid directly or indirectly through intermediaries.  And the opt-outs do not and cannot allege any facts showing that banks agreed with Visa or MasterCard to fix the merchant discount rates that acquiring entities charged to the opt-outs.  Instead, the opt-outs rely on the same "mark up" theory rejected as a matter of law in *In re ATM Fee*.  Because the opt-outs are nothing more than indirect payors of interchange fees, all their claims under federal antitrust law, which are all premised on allegedly inflated interchange fees, are barred by *Illinois Brick*.

### C.     The Opt-Outs Allege No Facts That Could Establish Any Exception to *Illinois Brick*

Nor do the opt-outs allege facts that could establish an exception to *Illinois Brick*.  As this Court has noted, "the indirect purchaser doctrine [of *Illinois Brick*] is strictly applied, and the exceptions are narrow."  *Payment Card*, 2013 WL 6510737, at *13.  In fact, the Supreme Court in *Illinois Brick* suggested that its rule may not apply in only two narrow circumstances.

The first is when the direct purchaser has entered into a pre-existing "cost-plus" contract to sell a specified quantity to the indirect purchaser.  *See Illinois Brick*, 431 U.S. at 732 n.12.  "In such a situation, the [direct] purchaser is insulated from any decrease in its sales as a result of attempting to pass on the overcharge, because its customer is committed to buying a fixed quantity regardless of price."  *Id.* at 736; *see also*, *e.g.*, *Kansas v. Utilicorp United, Inc.*, 497 U.S. 199, 218 (1990) (noting that in the absence of a cost-plus contract for a fixed quantity of gas, the court could not ascertain the precise apportionment of injury caused by an alleged overcharge).  Here, no opt-out alleges that its contract with a bank acquirer required the processing of a pre-

18

arranged and fixed quantity of Visa or MasterCard transactions, regardless of whether the opt-out could allege that its merchant discount fees were set at a fixed level above interchange fees.

The Supreme Court in *Illinois Brick* also suggested that its rule may not apply when "the direct purchaser is owned or controlled by its customer," that is, by the indirect purchaser. *Illinois Brick*, 431 U.S. at 736 n.16. But again, the opt-outs do not and cannot allege facts showing that they own or control the entities that acquired their Visa or MasterCard transactions.

Some lower courts have found a third exception to *Illinois Brick* when, because the direct purchaser is owned or controlled by its supplier, "there is no realistic possibility that the direct purchaser will sue its supplier over the antitrust violation." *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1145-46 (9th Cir. 2003) (citing *Royal Printing Co. v. Kimberly-Clark Corp.*, 621 F.2d 323, 326 (9th Cir. 1980)). Neither the Supreme Court nor the Second Circuit has adopted that exception to *Illinois Brick*. To the contrary, the Supreme Court has admonished that "even assuming that any economic assumptions underlying the *Illinois Brick* rule might be disproved in a specific case, we think it an unwarranted and counterproductive exercise to litigate a series of exceptions." *Utilicorp*, 497 U.S. at 217; *see also id.* at 216 ("[t]he possibility of allowing an exception, even in rather meritorious circumstances, would undermine the rule").

In any event, the opt-outs here do not even identify their acquiring entities, much less plead some factual basis showing that each named defendant owned or controlled those acquiring entities, or that defendants somehow possessed that ownership or control collectively. Moreover, the opt-outs cannot plead that there is "no realistic possibility" that acquiring entities would sue Visa or MasterCard, given the history of acquirers bringing antitrust claims of the very type that the opt-outs assert. *See NaBanco*, 596 F. Supp. at 1236 (challenging Visa's "methods of setting and determining the interchange fee"); *Visa U.S.A. Inc. v. First Data Corp.*, 2006 WL 1310448, at *2 (N.D. Cal. May 12, 2006) (counterclaiming that Visa "block[ed]

19

competition on interchange fees and merchant discounts through its 'honor all cards' rule and its

associated no discounts rule . . .").  The Ninth Circuit cases rejecting antitrust challenges to

network interchange fees confirm this conclusion.  *See In re ATM Fee*, 686 F.3d at 757 (rejecting

bank customers' reliance on *Freeman* because "this case does not involve a lack of a realistic

possibility of suit" by banks against the networks); *Kendall*, 518 F.3d at 1050 (rejecting

merchants' reliance on *Freeman* because merchants "failed to allege any facts establishing that

there is no realistic possibility" that banks will sue the networks).

Finally, some courts also have found a so-called "co-conspirator exception" to *Illinois*

*Brick* when a consumer asserts that a supplier conspired with a retailer (the direct purchaser) to

fix the *retail* price of the goods or services that the consumer purchased.  *See*, *e.g.*, *Dickson v.*

*Microsoft Corp.*, 309 F.3d 193, 214-15 (4th Cir. 2002); *Arizona v. Shamrock Foods Co.*, 729

F.2d 1208, 1211-13 (9th Cir. 1984).  In fact, that situation is not an exception to *Illinois Brick*,

because the consumer there is a *direct* purchaser of the allegedly price-fixed *retail* goods or

services.  Regardless, the opt-outs here do not allege that banks and Visa or MasterCard

conspired to fix the merchant discount fees that the opt-outs paid to their acquiring banks; rather,

the opt-outs allege that the interchange fees that acquiring banks paid to card-issuing banks were

fixed and inflated.  Accordingly, any so-called "co-conspirator exception" does not apply to the

opt-outs' claims.  *See*, *e.g.*, *In re ATM Fee*, 686 F.3d at 750-54 (rejecting "co-conspirator"

argument where bank customers alleged fixing not of ATM fees that they paid, but of network

interchange fees that banks paid to ATM owners); *Kendall*, 518 F.3d at 1050 (rejecting "co-

conspirator" argument where merchants "do not allege any facts showing that the [banks and

Visa or MasterCard] have any direct control over the . . . fee the acquiring bank chooses to

charge, or not charge, the merchant").

In short, the opt-outs allege no facts that could establish an exception to *Illinois Brick* for their claims as indirect payors of allegedly inflated interchange fees.  Thus, all the opt-outs' claims under federal antitrust law — under both Sherman Act § 1 and § 2 — should be dismissed.

## III.   *BUFFALO BROADCASTING* AND RELATED CASES BAR THE OPT-OUTS' SHERMAN ACT § 1 CLAIMS BASED ON VISA AND MASTERCARD DEFAULT INTERCHANGE RULES

A Sherman Act § 1 claim should be dismissed when the plaintiff fails to allege facts that could establish the required "restraint of trade."  15 U.S.C. § 1.  The reasonableness of alleged practices need not be addressed when the plaintiff pleads no facts to satisfy the threshold showing that there is a "restraint."  *See*, *e.g.*, *Buffalo Broadcasting*, 744 F.2d at 924 ("the initial and, as it turns out, dispositive issue on the merits is whether the [challenged conduct] has been proven to be a restraint of trade"); *CBS v. ASCAP*, 620 F.2d 930, 934-35 (2d Cir. 1980) (identifying as a "threshold" issue whether "the balancing of pro- and anti-competitive effects need not be undertaken," because the challenged conduct is not a "restraint at all").

Here, the opt-outs do not allege facts showing that Visa or MasterCard network default interchange rules are a "restraint."  The opt-outs do not allege that default interchange rules restrained the freedom of any bank to enter into bilateral agreements to supersede those rules or to compete outside the Visa or MasterCard networks.  Thus, under the principles of *Buffalo Broadcasting* and related cases, the opt-outs' claims that Visa and MasterCard default interchange rules violated Sherman Act § 1, and state statutes construed consistently with Sherman Act § 1, should be dismissed.

### A.   The Opt-Outs Do Not Allege That the Visa or MasterCard Network Default Interchange Rules Restrain Banks' Freedom to Compete

The opt-outs concede that the Visa and MasterCard network default interchange rules allow banks to enter into bilateral agreements that supersede those rules.  The opt-outs in *Target*

acknowledge that Visa's rules have provided that "'[i]nterchange reimbursement fees are determined by Visa . . . *or may be customized where [bank] members have set their own financial terms for the interchange of a Visa transaction* or Visa has entered into business agreements to promote acceptance and card usage.'" *Target* Compl. ¶ 77 (emphasis added). Likewise, the *Target* opt-outs recognize that MasterCard's rules have provided that MasterCard "'has the right to establish default interchange fees and default services fees . . . it being understood that all such fees set by [MasterCard] apply *only if there is no applicable bilateral interchange fee or services fee agreement between two Customers in place* . . . .'" *Id.* ¶ 78 (emphasis added). Other opt-outs also acknowledge that the default interchange rules have applied "[i]n the absence of a bilateral agreement between a merchant and an Issuing Bank." *Hawaiian* Compl. ¶ 17(E); *see also*, *e.g.*, *7-Eleven* Compl. ¶¶ 98, 102 (referring to "bilateral agreements").

The opt-outs assert that banks have not entered into permitted bilateral agreements regarding interchange fees, but not because of any feature of the default interchange rules. Instead, the opt-outs attribute the lack of bilateral agreements to the effect of *other* Visa and MasterCard network rules. For example, the opt-outs in *7-Eleven* allege that because of the "*Honor All Issuers rules* . . . , it does not make economic sense for any Issuer to compete on price because merchants are forced to accept that Issuer's cards," and "[b]ecause of *these rules*, Issuers have rebuffed overtures from merchants to enter into direct arrangements that would have benefitted the Issuer." *7-Eleven* Compl. ¶ 99 (emphasis added). The opt-outs in *Hawaiian* similarly allege that "Issuing Banks do not, and have not, independently negotiated Interchange Fees with merchants in a systematic way or to a competitively significant extent" as "*a result of*

*the Merchant Restraints*," which include "[t]he 'No Surcharge' rule, [and] the 'No Discount'

rule." *Hawaiian* Compl. ¶¶ 37, 17(L) (emphasis added).[7]

      The opt-outs also do not allege that the Visa or MasterCard default interchange rules have

prohibited banks from providing any payment card service that they could provide if they did not

participate in the networks or if the networks did not exist.  Banks have been free, for example,

to issue cards or acquire the transactions of both Visa and MasterCard, as well as other

competing networks such as American Express and Discover, and to issue private label cards.

*See*, *e.g.*, *7-Eleven* Compl. ¶ 84 ("[t]he Bank Defendants are members of both [the] Visa and

MasterCard networks"); *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d 322, 408 (S.D.N.Y.

2001) (barring Visa and MasterCard from having any rule "that prohibits its issuers from issuing

general purpose or debit cards . . . on any other general purpose network"), *aff'd*, 344 F.3d 229

(2d Cir. 2003).  And the opt-outs do not and cannot allege that the Visa or MasterCard default

interchange rules have prevented banks from joining each other's or any other debit network, in

order to issue debit cards bearing that network's logo or to acquire its debit transactions.

      **B.**    **Under *Buffalo Broadcasting* and Related Cases,
Network Rules That Do Not Limit Participants'
Freedom to Compete Do Not Restrain Trade**

      Accordingly, the opt-outs fail to allege facts that show the Visa and MasterCard default

interchange rules were a restraint of trade, under the principles of *Buffalo Broadcasting* and

related cases.  In *Buffalo Broadcasting*, local television stations challenged the blanket licensing

practices of ASCAP, an unincorporated membership association of music composers, authors, and

---

[7]  *See also*, *e.g.*, *7-Eleven* Compl. ¶¶ 98 ("[b]ecause of the Honor All Issuers rules, Issuers have no
incentive to enter into bilateral agreements"), 102 (same); *Hawaiian* Compl. ¶ 17(E) (there is no "reason
for the Issuing Bank to agree to a lower rate" unless "merchants could use . . . discounts and surcharging
. . . to effectively steer consumers to use lower cost cards"); *Target* Compl. ¶ 79 ("other Competitive
Restraints remove any independent competition among issuing banks in the setting of interchange fees").

publishers.  *See* 744 F.2d at 919.  ASCAP had the non-exclusive right to license performing rights for music on which its members held the copyright, and offered television and radio broadcasters a blanket license to broadcast all the compositions of ASCAP members.  *See id.* at 919-21. Because ASCAP possessed only non-exclusive licensing authority, broadcasters could negotiate different license agreements with any individual ASCAP member or group of members.  *See id.* at 923.  Nor did ASCAP prevent its members from licensing their music in any other way.  *See id.* Nevertheless, broadcasters typically bought ASCAP's blanket license.  *See id.* at 922, 930.

The Second Circuit held that ASCAP's blanket license did not constitute a restraint of trade under Sherman Act § 1, because the license did not impede the freedom of individual songwriters to negotiate separate licenses for their compositions with local broadcasters outside ASCAP.  *See id.* at 924-33.  Writing for the court, Judge Newman explained that although it was claimed to be "difficult" for broadcasters to license compositions outside ASCAP, it remained possible, and that the blanket license did not "restrain willing buyers and sellers from negotiating for the licensing of performing rights to individual compositions."  *Id.* at 929, 932. Judge Newman concluded that "[t]he blanket license is not even amenable to scrutiny under section 1 unless it is a restraint of trade. . . . Since the blanket license restrains no one from bargaining over the purchase and sale of music performance rights, it is not a restraint unless it were proven that there are no realistically available alternatives. . . . Not having been proven to be a restraint, it cannot be a violation of section 1."  *Id.* at 933.

In a concurring opinion, Judge Winter agreed that a non-exclusive venture that does not inhibit the freedom of its members to compete does not violate Sherman Act § 1:  "[S]o long as composers or producers have no horizontal agreement among themselves to refrain from source or direct licensing and there is no other artificial barrier, such as a statute, to their use, a non-exclusive blanket license cannot restrain competition."  *Id.* at 934.  "In those circumstances,"

Judge Winter explained, the non-exclusive blanket license "is simply one alternative competing on the basis of price and services with others." *Id.*[8]

The principles of *Buffalo Broadcasting* have been applied to businesses beyond music licensing.  *See*, *e.g.*, *Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 516 (4th Cir. 2002) (carry-on baggage template program may constitute a market innovation and would not restrain trade "'if an alternative opportunity . . . is realistically available'") (quoting *Buffalo Broadcasting*, 744 F.2d at 925); *Matsushita Elec. Indus. Co. v. Cinram Int'l, Inc.*, 299 F. Supp. 2d 370, 379 (D. Del. 2004) (patent pool did not restrain trade, because the defendant "realistically could avail itself of individual licenses" outside the patent pool); *Fed. Paper Bd. Co., Inc. v. Amata*, 693 F. Supp. 1376, 1383-84 & n.9 (D. Conn. 1988) (no restraint existed when defendant's alleged kickback arrangements with certain wastepaper suppliers did not prevent plaintiff from doing business with other individual suppliers).

In particular, the Second Circuit in *Paycom* applied the principles of *Buffalo Broadcasting* in affirming the dismissal of a merchant's antitrust claims challenging the MasterCard network's "chargeback" rules.  Those rules allowed a card-issuing bank to "chargeback" and recover funds paid to an acquiring bank when a cardholder disputed a charge on his payment card.  *See Paycom*, 467 F.3d at 291.  An acquirer to which a chargeback was issued decided whether to assess the chargeback against the merchant, and often did so.  *See id.* The Second Circuit held that MasterCard's rules did not create an agreement that restrained

---

[8]  Moreover, it was irrelevant in *Buffalo Broadcasting* that no one ASCAP member could duplicate the blanket license that ASCAP offered.  In earlier litigation involving the same blanket license, the Supreme Court observed that the license comprised the individual compositions of its members plus certain additional services, such that "the whole is truly greater than the sum of its parts; it is, to some extent, a different product."  *Broadcast Music, Inc. v. CBS*, 441 U.S. 1, 21-22 (1979).  Thus, ASCAP did not interfere with competition that could otherwise take place; instead, it added a new competitive option to the marketplace — the blanket license.

competition, because "[n]othing in Paycom's complaint sufficiently alleges that MasterCard's rules . . . prevented Paycom from negotiating with acquiring banks to create an individual solution to Paycom's costs of fraud." *Id.* at 292; *see also NaBanco*, 779 F.2d at 600 & n.13 (Visa-established interchange fees did not violate the Sherman Act when individual acquirers and issuers were free to bypass Visa's rules and negotiate their own fees).

As with the blanket license in *Buffalo Broadcasting* and the MasterCard network rules in *Paycom*, the opt-outs here acknowledge that the networks' default interchange rules allowed banks in the Visa and MasterCard networks to enter into bilateral agreements to supersede those rules. Moreover, the opt-outs do not allege that the Visa or MasterCard network default interchange rules restrained the freedom of any bank to compete in any other network. The opt-outs do not and cannot allege that those rules prevented banks from issuing cards or acquiring transactions of any competing network, such as the other network, American Express or Discover, any private label card network, or any debit network. Nor were banks prevented from forming their own competing payment card networks. Participating in the Visa or MasterCard networks did not prevent banks from providing any payment card service that they could provide if they did not participate in the networks or if the networks did not exist.

Thus, the opt-outs fail to allege that the Visa and MasterCard network default interchange rules constitute a restraint of trade. The opt-outs' claims that those rules violate Sherman Act § 1, and state statutes construed consistently with Sherman Act § 1, should be dismissed.

## IV. THE VISA AND MASTERCARD IPOS BAR THE OPT-OUTS' SHERMAN ACT § 1 CLAIMS FOR THE PERIOD SINCE EACH IPO

To state a claim under Sherman Act § 1, a plaintiff must plead not only a restraint of trade, but also that the restraint was the product of a "contract, combination . . . , or conspiracy" by multiple actors. 15 U.S.C. § 1. Accordingly, plaintiff must plead "enough factual matter

(taken as true) to suggest that an agreement was made" to restrain trade. *Bell Atl.*, 550 U.S. at 556. A "conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality." *Id.* at 557; *see also*, *e.g.*, *Mayor & City Council*, 709 F.3d at 135-38; *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50-51 (2d Cir. 2007). Here, the opt-outs fail to plead facts that could show banks conspired with Visa or MasterCard to determine their respective network rules after their IPOs. Therefore, the opt-outs' claims under Sherman Act § 1, and state statutes construed consistently with Sherman Act § 1, should be dismissed for the period after each IPO.

A.    **The Opt-Outs Acknowledge That the IPOs Made Visa and MasterCard Publicly Owned Companies, Ending Their Asserted "Structural" Conspiracies With Banks**

The opt-outs claim that before their respective IPOs, Visa and MasterCard each were membership associations owned and controlled by their member banks, which operated as "structural" conspiracies in determining the challenged Visa and MasterCard network rules. *See 7-Eleven* Compl. ¶¶ 3, 67-69, 72-73, 85-86, 95-96, 130; *Target* Compl. ¶¶ 43-44, 46-47, 55-57; *Hawaiian* Compl. ¶¶ 5-8, 46, 49. Regardless of whether there is any factual or legal support for that claim, the opt-outs allege no facts that could show those asserted "structural" conspiracies existed after the Visa and MasterCard IPOs.

To the contrary, the opt-outs concede that "MasterCard and Visa each changed their ownership structures through initial public offerings ('IPOs') wherein the member banks partially divested their ownership of Visa and MasterCard." *Target* Compl. ¶ 58. Visa "conducted an IPO" on March 19, 2008, in which it "acquired the ownership interest of certain member banks in Visa through the redemption and reclassification of approximately 270 million shares of Visa stock previously held by the member banks." *Hawaiian* Compl. ¶ 6. Likewise, on May 22, 2006, MasterCard "acquired from [its] members and then sold to the public some of

27

the stock it acquired." *Hawaiian* Compl. ¶ 8.  As a result, Visa and MasterCard each "became

and operates today as a publicly-traded Delaware corporation." *7-Eleven* Compl. ¶¶ 70, 74.

This Court previously dismissed the class merchants' claims that the MasterCard IPO

violated Sherman Act § 1 based on similar allegations.  *See Payment Card*, 2008 WL 5082872

(E.D.N.Y. Nov. 25, 2008).  This Court noted that the class merchants' post-IPO allegations

"actually demonstrate that the Banks do not retain sufficient control to allow them, for example,

to continue to impose supracompetitive interchange fees."  *Id.* at *10; *see also id.* (class

merchants alleged no facts inconsistent with "an independent MasterCard, run by directors and

managers with a fiduciary duty to act in MasterCard's best interests, rather than in the interests

of its customers or competitors").

For the same reasons, another court recently denied leave to amend dismissed claims that

banks conspired to determine Visa and MasterCard ATM network rules after their IPOs.  *See*

*Nat'l ATM Council, Inc. v. Visa Inc.*, — F. Supp. 2d —, 2013 WL 6671660 (D.D.C. Dec. 19,

2013), *appeal pending*.  That court found that "[a]llegations that the member banks made a prior

agreement when they were members of the bankcard associations do not suffice to allege a

current agreement," and that plaintiffs "did not allege facts that the banks could or did exercise

any control over Visa or MasterCard" after the IPOs.  *Id.* at *9; *see also Nat'l ATM Council, Inc.*

*v. Visa Inc.*, 922 F. Supp. 2d 73, 92-94 (D.D.C. 2012) (dismissing claims, in part because "there

are no factual allegations . . . that any control the banks may have once exercised over Visa and

MasterCard when they were associations continues today"), *appeal pending*.

> **B.** **The Opt-Outs Plead No Facts That Could**
> **Show a Horizontal Conspiracy Among**
> **Banks and Visa or MasterCard After the IPOs**

The opt-outs nevertheless assert that after the Visa and MasterCard IPOs, each of the

thousands of banks that participate in each network conspired "horizontally" among themselves,

and with Visa and MasterCard, to determine the challenged Visa and MasterCard network rules. But the opt-outs plead no facts that could establish such a conspiracy, for several reasons.

### 1. The Opt-Outs Plead No Post-IPO "Structural" Conspiracy

First, the opt-outs suggest that the asserted "structural" conspiracies continued after the Visa and MasterCard IPOs.  For example, some opt-outs offer general and conclusory allegations that banks "agreed prior to the IPOs that post-IPO Visa and MasterCard would continue to support the agreements not to compete and to fix prices," and that the "post-IPO structures for Visa and MasterCard . . . were designed to perpetuate, and not disturb the anticompetitive conduct."  *7-Eleven* Compl. ¶¶ 125, 127; *see also id.* ¶¶ 4, 85, 128, 130, 132.  But the opt-outs do not and cannot allege any facts supporting those conclusory allegations.  *See id.*  To the contrary, as shown above, the opt-outs specifically allege that through the IPOs, banks *divested* themselves of their asserted ownership of Visa and MasterCard, and thus their claimed ability to control each network's rules, and *restructured* Visa and MasterCard to be *publicly* owned and operated companies.  *See Target* Compl. ¶ 58; *Hawaiian* Compl. ¶¶ 6, 8; *7-Eleven* Compl. ¶¶ 70, 74.

The opt-outs also assert that after the IPOs, Visa and MasterCard have "continued to set 'default' interchange fees," "maintained and enforced" the other challenged Visa and MasterCard network rules, and not taken "any affirmative action to end" or withdraw those rules. *Target* Compl. ¶¶ 59, 135; *see also id.* ¶¶ 146, 158, 169; *7-Eleven* Compl. ¶ 133; *Hawaiian* Compl. ¶¶ 47, 50.  But the opt-outs plead no facts showing that *banks* collectively controlled any post-IPO decision of Visa or MasterCard to "maintain" or "not withdraw" its challenged network rules after its IPO.  *See id.*  The opt-outs' allegations are entirely consistent with Visa and MasterCard each *independently* making that decision.  Alleged "conduct that could just as well be independent action" cannot state a conspiracy claim. *Bell Atl.*, 550 U.S. at 557.

Indeed, Visa and MasterCard each had an independent interest in maintaining its challenged network rules. The Eleventh Circuit found that "universality of acceptance — the key element to a national payment system — could not be guaranteed absent prearranged [default] interchange rules." *NaBanco*, 779 F.2d at 602. As this Court similarly recognized, network rules such as the default interchange and honor all cards rules "undeniably have significant procompetitive effects" and "lay at the heart of Visa's and MasterCard's efforts to build the successful networks they now have." *Payment Card*, 2013 WL 6510737, at *6; *see also Payment Card*, — F. Supp. 2d —, 2014 WL 92465, at *2 (E.D.N.Y. Jan. 14, 2014) (Gleeson, J.) (noting "the indisputable procompetitive effects of the challenged network rules").[9]

## 2.    The Opt Outs Plead No Post-IPO "Hub and Spoke" Conspiracy

Second, the opt-outs suggest that there was a horizontal "hub and spoke" conspiracy after the Visa and MasterCard IPOs. The opt-outs assert that "even after the IPOs, the member banks of Visa and MasterCard continued to agree to and to enforce and adhere to" the challenged Visa and MasterCard network rules. *Target* Compl. ¶ 59; *see also 7-Eleven* Compl. ¶ 132; *Hawaiian* Compl. ¶¶ 47, 50. But that simply alleges parallel conduct by the banks — *i.e.*, that post-IPO, each bank individually decided to abide by the Visa and MasterCard network rules. Alleging "parallel conduct does not suggest conspiracy" because "that could just as well be independent action." *Bell Atl.*, 550 U.S. at 557; *see also*, *e.g.*, *Mayor & City Council*, 709 F.3d at 136 ("alleging parallel conduct alone is insufficient, even at the pleading stage").

---

[9]  The opt-outs in *7-Eleven* also assert that the "IPOs reflected changes merely in corporate form, not substantive conduct," based on a European Commission decision addressing the effect of MasterCard's IPO on its European multilateral interchange fee under European competition law. *7-Eleven* Compl. ¶ 134; *see also id.* at ¶¶ 135-36. But "[a]llegations of anticompetitive wrongdoing in Europe," made "[w]ithout an adequate allegation of facts linking transactions in Europe to transactions and effects here," cannot state an antitrust claim. *In re Elevator Antitrust Litig.*, 502 F.3d at 52.

Indeed, courts repeatedly have applied that principle in dismissing claims based on banks' allegedly parallel decisions to participate in, and follow the rules of, the Visa and MasterCard networks.  In *Kendall*, the Ninth Circuit affirmed the dismissal of claims that banks in the Visa and MasterCard payment networks conspired by "knowingly, intentionally and actively" enforcing Visa and MasterCard rules allegedly fixing interchange fees.  518 F.3d at 1048.  The Ninth Circuit held that parallel conduct in "charging, adopting or following the fees set by a Consortium is insufficient as a matter of law to constitute a violation of Section 1 of the Sherman Act."  *Id.*  More recently, the court in *National ATM Council* dismissed claims that banks conspired in enforcing Visa and MasterCard network ATM rules, and denied leave to amend, because the allegedly parallel "membership in an association . . . is not enough to establish agreement or conspiracy."  *Nat'l ATM Council*, 2013 WL 6671660, at *9 (internal quotation omitted).

To plead a horizontal "hub and spoke" conspiracy, the opt-outs would need to allege facts that could show not just parallel conduct by banks, but an agreement *among banks* to restrain trade — *i.e.*, a "wheel" or "rim," and not just parallel "spoke" arrangements between each individual bank and Visa or MasterCard.  *See*, *e.g.*, *In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 327 (3d Cir. 2010) (affirming dismissal of Sherman Act § 1 claim because "one cannot plausibly infer a horizontal agreement among a broker's insurer-partners from the mere fact that each insurer entered into a similar contingent commission agreement with the broker"); *PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 420 (5th Cir. 2010) (affirming dismissal of Sherman Act § 1 conspiracy claim because plaintiffs alleged "no wheel and therefore no hub-and-spoke conspiracy").  Here, the opt-outs fail to allege any communications among banks, or other bank conduct, post-IPO that could show the banks collectively had the ability to control and agreed to control the challenged Visa or MasterCard network rules.  *See*,

31

*e.g.*, *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 110 (2d Cir. 2002) (affirming summary judgment when plaintiff "offered no evidence of direct communications among the [spokes]" of the alleged horizontal conspiracy).

The most the opt-outs offer are conclusory allegations that "[i]t would be contrary to the independent self-interest of any single issuing bank to adhere to the" challenged Visa or MasterCard network rules "without the agreement of the remaining issuing banks." *Target* Compl. ¶ 60; *see also*, *e.g.*, *id.* ¶¶ 134, 145, 157, 168; *Hawaiian* Compl. ¶¶ 48, 51. But the opt-outs allege no facts showing why that would be the case, given that adherence to a network's set of rules is the condition for the economic advantages that flow to banks from issuing the network's cards or acquiring its card transactions. An individual bank's decision to adhere to a broad set of network rules that Visa or MasterCard each unilaterally establishes, in order to obtain the economic advantages of participating in the network, *is* in the independent self-interest of the bank. And that adherence no more reflects a horizontal conspiracy among banks to restrain trade through specific network rules than the fact that merchants' agreements to adhere to those same network rules could show that merchants horizontally conspired to restrain trade. As another court recently concluded in dismissing conspiracy claims based on banks' alleged adherence to Visa and MasterCard ATM network rules: "Why would it not be in each bank's independent self-interest to adopt the rules proffered by Visa or MasterCard to be able to handle . . . ATM transactions? . . . [W]hat alleged facts suggest that any individual bank would only want to do it as long as other banks did it? These complaints do not have the[se] additional facts." *Nat'l ATM Council*, 922 F. Supp. 2d at 95; *see also Nat'l ATM Council*, 2013 WL 6671660, at *9 (subsequently denying motion to amend complaint for same reason).

Indeed, the opt-outs allege benefits to banks from adhering to the Visa and MasterCard network rules that would provide each bank with an independent self-interest for doing so. For

example, the opt-outs in *Hawaiian* acknowledge that "[i]n view of the present-day penetration of

Visa and MasterCard Credit Cards, banks . . . find it in their interest to issue Visa and/or

MasterCard Credit Cards and acquire merchants transactions . . . ." *Hawaiian* Compl. ¶ 42.  The

opt-outs in *7-Eleven* similarly allege that Visa's and MasterCard's general purpose credit cards

each have become "the primary or only such cards for tens of millions of consumers in the

United States," and that general purpose debit card "issuance continues to be profitable."

*7-Eleven* Compl. ¶¶ 110, 115, 146.

### 3.    The Opt Outs Plead No Post-IPO
### Conspiracy Under *American Needle*

Third, the opt-outs assert that "the member banks have ceded to Visa and MasterCard

decision-making and action with respect to the terms upon which they will allow merchants to

accept the cards they issue," and "have deprived the marketplace of independent centers of

decision-making and, therefore, of actual or potential competition." *Target* Compl. ¶ 62; *see

also 7-Eleven* Compl. ¶¶ 85-86, 129 (banks "effectively delegated" to Visa and MasterCard "the

ability to fix the banks' Interchange Fees").  Those conclusory allegations seek, but fail, to state

a post-IPO conspiracy claim based on *American Needle, Inc. v. National Football League*, 560

U.S. 138 (2010).

In *American Needle*, the Supreme Court considered whether NFL teams could have

conspired under Sherman Act § 1 by licensing their independently owned team trademarks under

common and exclusive terms through the NFL.  *See id.* at 186.  As the Supreme Court explained,

that issue depended on whether the decision of a jointly owned entity like the NFL "'depriv[es]

the marketplace of independent centers of decisionmaking'" and "thus of actual or potential

competition."  *Id.* at 190 (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752,

769 (1984)).  Because each individual team was an independent competitor in a market for team

trademark licenses, a decision by each team to cede its individual trademark licensing rights exclusively to the NFL deprived the marketplace of those independent decision-makers. *Id.* at 195-96.

The opt-outs fail to allege similar facts regarding banks in the Visa or MasterCard networks.  Whereas in *American Needle* each NFL team independently owned the licensing rights to its own team logo, which it ceded to the league, the opt-outs do not and cannot allege that each bank ever independently had the authority to determine Visa or MasterCard network default interchange rules, or other payment acceptance rules, which the bank could have ceded to Visa or MasterCard.  The opt-outs cannot allege that any entity other than Visa or MasterCard has had the right or ability to establish the rules for transactions processed over its network. Accordingly, the opt-outs cannot plead the delegation of independent decision-making authority necessary to allege a conspiracy under *American Needle.  See Nat'l ATM Council*, 922 F. Supp. 2d at 95-96 (finding allegations that banks ceded control over ATM network rules to Visa or MasterCard could not state a conspiracy claim under *American Needle*).

In short, the opt-outs allege no facts that could show that after the IPOs, banks conspired "horizontally" among themselves to determine the challenged Visa or MasterCard network rules. Therefore, the opt-outs' claims based on asserted horizontal conspiracies under Sherman Act § 1, and state statutes construed consistently with Sherman Act § 1, should be dismissed for the period after the IPOs.

> **C.   The Opt-Outs Plead No Facts That Could
>         Show a Vertical Conspiracy Between Each
>         <u>Bank and Visa or MasterCard After the IPOs</u>**

Some opt-outs also offer conclusory allegations that "Visa and MasterCard entered into express *vertical* agreements with each of their member banks, binding all of their member banks to comply with the rules and regulations of their networks, including the rules at issue."

*7-Eleven* Compl. ¶ 137 (emphasis added); *see also id.* ¶¶ 138, 228-51; *Target* Compl. ¶¶ 136, 147, 159, 170.  But the opt-outs cannot salvage their post-IPO conspiracy claims by relabeling their allegations that banks adhered to Visa and MasterCard network rules as a vertical conspiracy rather than a horizontal conspiracy.

As the Second Circuit has concluded, "every action by [an] association is not concerted action by the association's members."  *AD/SAT, A Division of Skylight, Inc. v. Associated Press*, 181 F.3d 216, 234 (2d Cir. 1999).  Rather, consistent with Supreme Court precedent, a plaintiff must "show that association members, in their individual capacities, consciously committed themselves to a common scheme designed to achieve an unlawful objective."  *Id.* (discussing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986), and *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752 (1984)).

Applying that principle, the Tenth Circuit rejected claims that American Airlines engaged in a conspiracy with the members of its AAdvantage travel rewards program, simply because a program rule claimed to be an antitrust violation was "part of a contract between American and any member of its AAdvantage program who receives an award."  *Am. Airlines v. Christensen*, 967 F.2d 410, 412 (10th Cir. 1992).  The Tenth Circuit reasoned that there was no suggestion "that American did not independently set the terms under which it would offer travel rewards, and the mere fact that its members accepted those terms does not generate the kind of concerted action needed to violate Section 1."  *Id.* at 413-14; *see also*, *e.g.*, *Toscano v. Prof'l Golfers' Ass'n*, 258 F.3d 978, 984 (9th Cir. 2001) (local sponsors' adherence to PGA Tour's rules showed "only that [they] accepted the fact that the tournaments would be operated according to the PGA Tour's rules and regulations, not that they agreed to use those rules to restrain trade").

The opt-outs fail to allege a vertical conspiracy for the same reasons.  As shown above, the opt-outs allege no facts showing that after the IPOs, Visa and MasterCard did not

35

independently determine their respective network rules.  The opt-outs' allegation that banks accepted the fact that Visa and MasterCard each would be operated according to its independently determined network rules cannot show that the banks conspired with Visa or MasterCard to use the challenged network rules to restrain trade.

Moreover, the Third Circuit recently rejected the opt-outs' pleading tactic of reasserting a horizontal conspiracy claim as a vertical conspiracy claim.  In *Howard Hess Dental Laboratories, Inc. v. Dentsply International, Inc.*, 602 F.3d 237 (3d Cir. 2010), the Third Circuit affirmed dismissal of the alternative pleading of a horizontal conspiracy between an artificial tooth manufacturer and its dealers as "several bilateral, vertical conspiracies," because it was simply an "effort to circumvent a motion to dismiss" the horizontal conspiracy claims.  *Id.* at 256-57.  The Third Circuit saw "no indication of the [p]laintiffs' intention to allege that every single agreement between [the manufacturer] and each [d]ealer had anticompetitive effects," or how the vertical conspiracy operated "lacking a horizontal tether."  *Id.* at 256.

The same is true of the opt-outs' claims based on asserted post-IPO vertical conspiracies.  *See Target* Compl. ¶¶ 136, 147, 159, 170; *7-Eleven* Compl. ¶¶ 137-38, 228-51.  Thus, the opt-outs' claims based on asserted vertical conspiracies under Sherman Act § 1, and state statutes construed consistently with Sherman Act § 1, should be dismissed for the period after the IPOs.

## V.     THE OPT-OUTS' CLAIMS BASED ON DEBIT INTERCHANGE FEES ARE BARRED FOR THE PERIOD AFTER THOSE FEES BECAME SUBJECT TO FEDERAL REGULATION

The opt-outs also cannot maintain any claims based on allegedly inflated debit interchange fees for the period since October 1, 2011, when federal regulations controlling debit interchange fees went into effect.  Those claims are barred by the "filed rate" doctrine, and the opt-outs cannot allege an actionable antitrust injury based on their asserted payment of debit interchange fees controlled by federal law.

In 2010, Congress passed and the President signed the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376, 2068-2074 (2010) (the "Dodd-Frank Act").  The Dodd-Frank Act includes several provisions — known as the "Durbin Amendment" — that provide for federal regulation of debit interchange fees.  Under those provisions, the Federal Reserve Board may "prescribe regulations . . . regarding any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction."  15 U.S.C. § 1693o–2(a)(1).  The Act further requires that "[t]he amount of any interchange transaction fee that an issuer may receive or charge with respect to an electronic debit transaction shall be reasonable and proportional to the cost incurred by the issuer with respect to the transaction."  15 U.S.C. § 1693o–2(a)(2).

The Federal Reserve Board's final rule determining debit interchange fees became effective on October 1, 2011.  *See* Final Rule, Debit Card and Interchange Fees and Routing, 76 Fed. Reg. 43,394, 43,395 (July 20, 2011) (codified at 12 C.F.R. §§ 235.1-235.10).  That rule provided that a debit interchange fee is "reasonable and proportional to the cost incurred" when it "is no more than the sum of — (1) 21 cents and; (2) 5 basis points multiplied by the value of the transaction," subject to an allowable fraud-prevention adjustment "of no more than 1 cent per transaction."  12 C.F.R. 235.3 and 235.4; *see also 7-Eleven* Compl. ¶ 114 (noting this rule); *Target* Compl. ¶ 19 (same).

Because of those federal regulations, the opt-outs' claims based on their asserted payment of debit interchange fees since October 1, 2011 should be dismissed, for two reasons.  First, the "filed rate" doctrine "holds that any 'filed rate' — that is, one approved by the governing regulatory agency — is per se reasonable and unassailable in judicial proceedings brought by ratepayers."  *Simon*, 694 F.3d at 204 (internal quotation omitted).  Thus, a plaintiff's claim based on a rate approved by a government regulatory agency should be dismissed.  *See*, *e.g.*, *Square D*

*Co. v. Niagara Frontier Tariff Bureau Inc.*, 476 U.S. 409, 416 (1986) (affirming dismissal of antitrust claims under the filed rate doctrine because the government agency's "approval had, in effect, established the lawfulness of the defendant's rates"); *Simon*, 694 F.3d at 204-208 (same).

The opt-outs in *Target* allege that while their damages from "the imposition of supracompetitive debit interchange fees may be reduced by regulatory maxims, the interchange fees being levied . . . are still higher than they would be if there were active competition for merchant acceptance." *Target* Compl. ¶¶ 153, 176. That is irrelevant. Pursuant to the Durbin Amendment, the Federal Reserve Board determined that debit interchange fees in any amount up to the regulated cap were "reasonable and proportional to the cost incurred." 15 U.S.C. § 1693o-2(a)(2); 12 C.F.R. 235.3. The filed rate doctrine precludes a claim based on rates that are consistent with the cap imposed by a government agency. *See*, *e.g.*, *Simon*, 694 F.3d at 207 (affirming dismissal of claim because "FERC exercised tight control over the rate by imposing price caps on the major producers").

Second, no actionable antitrust injury exists when a plaintiff's asserted injury flows from the operation of federal law. For example, in *In re Canadian Import Antitrust Litigation*, 470 F.3d 785 (8th Cir. 2006), a class of consumers alleged that pharmaceutical manufacturers conspired in violation of Sherman Act § 1 to suppress the importation of Canadian drugs for personal use, and thereby raise drug prices in the United States. *Id.* at 787-88. Affirming dismissal of those claims, the Eighth Circuit stated that "[t]he absence of competition from Canadian sources in the domestic prescription drug market . . . is caused by the federal statutory and regulatory scheme adopted by the United States government," and thus "the alleged conduct of the defendants did not cause an injury of the type that the antitrust laws were designed to remedy." *Id.* at 791; *see also*, *e.g.*, *CBC Cos., Inc. v. Equifax, Inc.*, 561 F.3d 569, 573 (6th Cir. 2009) (affirming dismissal of antitrust claims because "[n]o cognizable antitrust injury exists

where the alleged injury is a byproduct of the regulatory scheme or federal law rather than of the defendant's business practices") (internal quotation omitted); *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 266 (3d Cir. 1998) (antitrust claims properly dismissed because plaintiff's "inability to choose to buy from [either allegedly conspiring defendant] is an injury visited upon it by the regulated nature of utility services").

Here, the opt-outs' claimed injury from allegedly inflated debit interchange fees since October 1, 2011 flows from the federally regulated determination of what debit interchange fees are reasonable. Therefore, all the opt-outs' claims based on allegedly inflated debit interchange fees since October 1, 2011 should be dismissed.

## CONCLUSION

For the foregoing reasons, defendants respectfully request that the Court enter an order dismissing the claims in the opt-outs' complaints with prejudice.

Dated: March 13, 2014.                    Respectfully submitted,

                                          **ARNOLD & PORTER LLP**

                                          By: /s/ Robert C. Mason
                                              Robert C. Mason
                                              399 Park Avenue
                                              New York, NY   10022
                                              (212) 715-1000
                                              robert.mason@aporter.com

                                              Robert J. Vizas
                                              Three Embarcadero Center, 10th Floor
                                              San Francisco, CA   94111

                                              Mark R. Merley
                                              Matthew A. Eisenstein
                                              555 12th Street, NW
                                              Washington, DC   20004

**HOLWELL SHUSTER & GOLDBERG LLP**

Richard J. Holwell
Michael S. Shuster
Demian A. Ordway
Zachary A. Kerner
125 Broad Street, 39th Floor
New York, NY   10004
(646) 837-5151
mshuster@hsgllp.com

*Counsel for Defendants Visa Inc., Visa U.S.A.
Inc., and Visa International Service
Association*[10]


**PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP**

By: /s/ Kenneth A. Gallo
Kenneth A. Gallo
2001 K Street, NW
Washington, DC   20006
(202) 223-7300
kgallo@paulweiss.com

Andrew C. Finch
Gary R. Carney
1285 Avenue of the Americas
New York, NY   10019

---

[10]  Arnold & Porter LLP is counsel to the Visa defendants as to all opt-out plaintiffs except for Barnes &
Noble, Inc., Barnes & Noble College Booksellers LLC, J.C. Penney Corporation, and The TJX
Companies, Inc. and related entities.

**WILLKIE FARR & GALLAGHER LLP**

Keila D. Ravelo
Wesley R. Powell
Matthew Freimuth
787 Seventh Avenue
New York, NY   10019
(212) 728-8000
kravelo@willkie.com

*Attorneys for Defendants MasterCard*
*Incorporated and MasterCard International*
*Incorporated*


**MORRISON & FOERSTER LLP**

By:  /s/ Mark P. Ladner
Mark P. Ladner
Michael B. Miller
1290 Avenue of the Americas
New York, NY   10104
(212) 468-8000
mladner@mofo.com

**ZEICHNER ELLMAN & KRAUSE LLP**

David B. Chenkin
Jantra Van Roy
1211 Avenue of the Americas
New York, NY   10036
(212) 223-0400
dchenkin@zeklaw.com

*Attorneys for Defendants Bank of America*
*Corporation, Bank of America, N.A., and FIA*
*Card Services, N.A.*[11]

---

[11]  Morrison & Foerster LLP is counsel for the Bank of America defendants as to all opt-out plaintiffs except for Academy Ltd., Beall's, Inc., Costco Wholesale Corp., Dillard's, Inc., Gap, Inc., GNC Holdings, Inc., and Michaels Stores, Inc., as to which opt-out plaintiffs Zeichner Ellman & Krause LLP is counsel for the Bank of America defendants.

**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**

By: /s/ Peter E. Greene
    Peter E. Greene
    Peter S. Julian
    Boris Bershteyn
    Four Times Square
    New York, NY   10036
    (212) 735-3000
    peter.greene @skadden.com

*Attorneys for Defendants JPMorgan Chase & Co., Chase Bank USA, N.A., Chase Paymentech Solutions, LLC, and JPMorgan Chase Bank, N.A.*


**SIDLEY AUSTIN LLP**

By: /s/ David F. Graham
    David F. Graham
    One South Dearborn Street
    Chicago, IL   60603
    (312) 853-7000
    dgraham@sidley.com

    Benjamin R. Nagin
    Eamon Joyce
    787 Seventh Avenue
    New York, NY   10019

*Attorneys for Defendants Citigroup Inc., Citibank, N.A., and Citicorp Payments Services, Inc.*

**PATTERSON BELKNAP WEBB & TYLER LLP**

By:  /s/ Robert P. LoBue
       Robert P. LoBue
       William F. Cavanaugh
       1133 Avenue of the Americas
       New York, NY   10036
       (212) 336-2000
       rlobue@pbwt.com

*Attorneys for Defendants Wells Fargo & Company and Wells Fargo Bank, N.A*