UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | Case No. 14-MD-01720 (JG) (JO) |
| This Document Relates to: All Opt-Out Cases | |

**CIRCUIT CITY PLAINTIFFS' MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

859156.6

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ............................................................................................................................3

    A.      The *Visa Check* Release and *Payment Card* Class Settlement ...............................3

    B.      The Circuit City Plaintiffs' Complaints..................................................................4

ARGUMENT ..................................................................................................................................6

I.      THE *VISA CHECK* RELEASE DOES NOT BAR PLAINTIFFS' CLAIMS .......................7

II.     THE CIRCUIT CITY PLAINTIFFS HAVE STANDING UNDER *ILLINOIS BRICK* TO BRING FEDERAL ANTITRUST CLAIMS FOR DAMAGES .........................7

    A.      The Circuit City Plaintiffs Specifically Allege That They Directly Paid Interchange Fees ...................................................................................................7

    B.      *Illinois Brick* Does Not Bar Claims for Purchases Directly from a Co-Conspirator............................................................................................................9

III.    THE APPLICATION OF *BUFFALO BROADCASTING* IS PREMATURE AND, IN ANY EVENT, DOES NOT BAR PLAINTIFFS' CLAIMS ..........................................11

    A.      Defendants' Argument Is Improper on a Motion to Dismiss ................................11

    B.      The Circuit City Plaintiffs Allege That There Were No Realistically Available Alternatives to the Payment of Defendants' Default Interchange Fees .......................................................................................................................13

IV.    DEFENDANTS' IPOS HAVE NO EFFECT ON PLAINTIFFS' CLAIMS FOR THE PERIOD SINCE EACH IPO ..........................................................................................14

V.     THE FILED-RATE DOCTRINE DOES NOT APPLY TO PLAINTIFFS' CLAIMS ................................................................................................................................14

CONCLUSION.............................................................................................................................14

# **TABLE OF AUTHORITIES**

**Page(s)**

**CASES**

*Anderson News, L.L.C. v. Am. Media*,
  680 F.3d 162 (2d Cir. 2012)..............................................................................................6

*Arizona v. Shamrock Foods Co.*,
  729 F.2d 1208 (9th Cir. 1984) ..........................................................................................9

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)..........................................................................................................6

*Broadcast Music, Inc. v. Hearst/ABC Viacom Ent. Servs.*,
  746 F. Supp. 320 (S.D.N.Y. 1990).................................................................................12

*Buffalo Broadcasting Co. v. ASCAP*,
  744 F.2d 917 (2d Cir. 1984)..........................................................................2, 11, 12, 13

*CBS, Inc. v. ASCAP*,
  620 F.2d 930 (2d Cir. 1980)......................................................................................11, 12

*Chatham Brass Co. v. Honeywell*,
  512 F. Supp. 108 (S.D.N.Y. 1981)..................................................................................9

*Cont'l Airlines, Inc. v. United Airlines, Inc.*,
  277 F.3d 499 (4th Cir. 2002) .........................................................................................13

*Fed. Paper Bd. Co. v. Amata*,
  693 F. Supp. 1376 (D. Conn. 1998)...............................................................................13

*Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*,
  386 F.3d 485 (2d Cir. 2004)...........................................................................................12

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977)................................................................................................ *passim*

*In re ATM Fee Antitrust Litig.*,
  686 F.3d 741 (9th Cir. 2012) .........................................................................................10

*In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*,
  No. 05-md-1720 (E.D.N.Y.)  ......................................................................................3, 4

*In re Visa Check/Mastermoney Antitrust Litigation*,
  No. 96-cv-05238 (E.D.N.Y.)  ............................................................................1, 3, 7, 8

*Kendall v. Visa U.S.A., Inc.*,
  518 F.3d 1042 (9th Cir. 2008) .......................................................................................10

*Laumann v. Nat'l Hockey League*,
    907 F. Supp. 2d 465 (S.D.N.Y. 2012)..................................................................................10

*Law Offices of Curtis V. Trinko v. Atl. Corp.*,
    305 F.3d 89 (2d Cir. 2002) *rev'd on other grounds sub nom.*, 540 U.S. 398 (2004) ................9

*Lowell v. American Cyanamid Co..*,
    177 F.3d 1228 (11th Cir. 1999......................................................................................................9

*Matsushita Elec. Indus. Co. v. Cinram Int'l, Inc.*,
    299 F. Supp. 2d 370 (D. Del. 2004).....................................................................................13

*Meredith Co. v. SESAC LLC,*
    2011 U.S. Dist. LEXIS 24517 (S.D.N.Y. Mar. 8, 2011) .........................................................12

*Paper Sys. Inc. v. Nippon Paper Indus. Co.*,
    281 F.3d 629 (7th Cir. 2002) ................................................................................................10

*Paycom Billing Servs. v. MasterCard Int'l*,
    467 F.3d 283 (2d Cir. 2006)............................................................................................10, 13

*Temple v. Circuit City Stores, Inc.*,
    2007 WL 2790154 (E.D.N.Y. Sep. 25, 2007).........................................................................8

*United States v. Visa U.S.A., Inc.*,
    344 F.3d 229 (2d Cir. 2003)....................................................................................................2

*Visa U.S.A., Inc. v. Nat'l Ass'n of Convenience Stores*,
    Case No. 05-md-01720 ...........................................................................................................8

*Visa U.S.A., Inc. v. Wal-Mart Stores, Inc.*,
    Case No. 13-cv-03355 .............................................................................................................8

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005) ................................................................................................1, 3

**STATUTES**

15 U.S.C. §§ 1 and 2 ................................................................................................... *passim*

Federal Rule of Civil Procedure 12(b)(6) ........................................................................................6

**PRELIMINARY STATEMENT**

Plaintiffs in the following actions: *Siegel,* No. 13-cv-4581 (Circuit City); *Smith*, No. 13-cv-4582 (Borders); *Meta Advisors*, No. 13-cv-4583 (Deel); and *Performance Food Group*, No. 13-cv-4822 (PFG) (collectively, the "Circuit City Plaintiffs")[1] file this opposition to the collective motion to dismiss all of the opt-out complaints filed by defendants Visa, Inc., Visa U.S.A., Inc., and Visa International Service Association ("Visa"), and MasterCard Incorporated and MasterCard International Incorporated ("MasterCard") (collectively, "Defendants").  During the Relevant Time Period,[2] the Circuit City Plaintiffs directly paid artificially-inflated interchange fees and suffered hundreds of millions of dollars in damages as a result of Defendants' anticompetitive conduct.  For the reasons explained below (and where appropriate, incorporated by reference from other opt-outs' oppositions), Defendants' efforts to escape liability on this motion to dismiss have no merit.

First, as this Court and others have held, the class action release in *In re Visa Check/Mastermoney Antitrust Litigation*, No. 96-cv-05238 (E.D.N.Y. 2003) ("*Visa Check*"), does not absolve Defendants of liability *in perpetuity* for their anticompetitive conduct after January 1, 2004, which is the conduct at issue here.  As more fully explained in the *7-Eleven* Plaintiffs' brief—which the Circuit City Plaintiffs incorporate herein as to the argument on the *Visa Check* release—Defendants' position ignores the plain terms of the release and the Second Circuit's holding that under the release, "[c]onduct occurring after December 31, 2003 is not precluded from being the subject of a future suit." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,

---

[1] On April 22, 2014, counsel for the Circuit City Plaintiffs filed a complaint on behalf of Dots, LLC, which asserts the same claims and makes similar allegations as in the complaints filed by the other Circuit City Plaintiffs.  (No. 14-cv-2551).  As of the date of this filing, the *Dots* action had not yet been transferred to this Court.

[2] The Relevant Time Period is the period between January 1, 2004 and the settlement preliminary approval date of November 28, 2012.  For the Court's convenience, Plaintiffs will cite the factual allegations in Circuit City's complaint herein, which is substantially similar to the complaints of the other Circuit City Plaintiffs.  All capitalized terms in this brief shall have the definitions given to them in Circuit City's complaint, unless otherwise stated.

396 F.3d 96, 104, 110 (2d Cir. 2005) ("*Wal-Mart*").

Second, *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), which generally holds that direct purchasers who pay an alleged overcharge can sue for antitrust damages, poses no bar to the Circuit City Plaintiffs' claims, because they specifically allege that they, not the Acquiring Banks, directly paid interchange fees to the Issuing Banks.  Furthermore, even if the Acquiring Banks were the direct payers—a matter to be determined after discovery—the Circuit City Plaintiffs allege that the Acquiring Banks were participants in the conspiracy with Defendants, satisfying the "co-conspirator exception" to *Illinois Brick*.

Third, Defendants' reliance on *Buffalo Broadcasting Co. v. ASCAP*, 744 F.2d 917 (2d Cir. 1984), for the proposition that their default interchange rules are not a "restraint" under Section 1 of the Sherman Act, is misplaced.  *Buffalo Broadcasting* was decided on appeal following trial on the merits, not on a motion to dismiss.  Based on a fully-developed record, the Second Circuit used a "rule of reason" analysis to determine that a unique, non-exclusive blanket license governing the use of copyrighted music was not a "restraint of trade."  Central to that determination was the Court's conclusion that the licensing practice could not be deemed a restraint of trade unless there were no realistically available alternatives to that practice.  The Circuit City Plaintiffs' allegations that there were no such realistically available alternatives to accepting Defendants' default interchange rules are more than sufficient at the pleading stage.

Fourth, Defendants misread the Circuit City Plaintiffs' complaints in arguing that their Section 1 claims should be dismissed for the period after Defendants' IPOs.  As more fully explained in the *7-Eleven* Plaintiffs' brief—which the Circuit City Plaintiffs incorporate herein as to Defendants' post-IPO argument—Defendants ignore the Circuit City Plaintiffs' allegations that Defendants never withdrew from their pre-IPO conspiracies, which the Second Circuit and foreign courts have held were "structural conspiracies."  *See, e.g., United States v. Visa U.S.A., Inc.*, 344 F.3d 229, 242 (2d Cir. 2003).  Moreover, the Circuit City Plaintiffs allege that after the IPOs, Defendants continued to facilitate horizontal conspiracies between the member banks that reinforced their adherence to Defendants' default interchange rules and the Merchant Restraints.

Fifth, the filed-rate doctrine is largely inapplicable to the Circuit City Plaintiffs' complaints because: (1) they do not allege facts relating to the setting of debit interchange fees; and (2) two of the Circuit City Plaintiffs—particularly Circuit City and Borders—had stopped operating stores that accepted Visa and MasterCard prior to October 2011. To the extent Defendants' filed-rate argument applies to Deel and PFG, Plaintiffs incorporate by reference the argument in the *Target* Plaintiffs' opposition.

For these reasons, and as discussed in greater detail below, Defendants' motion to dismiss the Circuit City Plaintiffs' complaints should be denied.

## BACKGROUND

### A.  The *Visa Check* Release and *Payment Card* Class Settlement

In 1996, a class of merchants sued Defendants in *Visa Check* for federal antitrust violations. The case resulted in settlements that released Defendants from all claims "relating in any way to any conduct *prior to January 1, 2004 concerning any claims alleged in the Complaint*," including "claims which have been asserted or could have been asserted in this litigation." *Visa Check*, 2005 WL 6054267 [Visa Settlement] ¶ 28 and 2005 WL 6054266 [MasterCard Settlement] ¶ 30 (emphasis added). This Court approved the settlements and described the release as barring "claims arising out of the conduct at issue in the action prior to January 1, 2004." *Visa Check*, 297 F. Supp. 2d 503, 508 (E.D.N.Y. 2004). On appeal, the Second Circuit confirmed that the release "precludes actions for conduct occurring prior to January 1, 2004," and cautioned, significantly, that "[c]onduct occurring after December 31, 2003 is *not precluded from being the subject of a future suit*." *Wal-Mart*, 396 F.3d at 104, 110 (emphasis added).

In 2005, merchants filed new class action lawsuits against Defendants that were consolidated in MDL 1720 ("*Payment Card*"). Defendants moved to dismiss claims for damages to the extent those damages were incurred *before* January 1, 2004, citing the *Visa Check* release. *Payment Card*, 2008 WL 115104, *6 (E.D.N.Y. Jan. 8, 2008). At oral argument, Defendants assured the Court that they were not taking the "extreme position" that Defendants "could

engage in price fixing in … 2003 and … get immunity for continuing illegal conduct in 2004, 5, and [6]." Tr. of Proceedings, Nov. 21, 2006, at 35 (*Payment Card* Dkt. No. 738). This Court granted Defendants' motion on the grounds raised, but made no ruling with respect to claims for damages incurred *after* January 1, 2004. *Id.* at *16. In fact, in analyzing the applicability of the release to a credit interchange fee increase in 2003 (prior to the effective date of the release), the Court reasoned that class counsel plausibly concluded that such an interchange fee increase "would wipe out much of the benefit to the class *but would presumably be subject to renewed litigation starting in 2004 if continued in effect*." *Id.* at *14 (emphasis added).

The *Payment Card* litigation resulted in a settlement between class merchants and Defendants. The settlement gave class members the right to opt out by May 28, 2013. Each of the Circuit City Plaintiffs opted out of the settlement and filed its own complaint against Visa and MasterCard.

### B. The Circuit City Plaintiffs' Complaints

The Circuit City Plaintiffs have sued Visa and MasterCard for violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, arising out of Defendants' agreements with each of their member banks to: (1) fix default interchange fees; (2) adopt and enforce Merchant Restraints that govern merchant acceptance of their payment cards at the point of sale; (3) tie distinct payment card products and Network Services; and (4) use their market power to monopolize or attempt to monopolize the markets for General Purpose Payment Cards and Network Services.[3] As a result of Defendants' unlawful conduct, the Circuit City Plaintiffs paid hundreds of millions of dollars in supracompetitive interchange fees.

Defendants' Merchant Restraints are at the core of the Circuit City Plaintiffs' antitrust allegations. The Merchant Restraints include Defendants' "No Surcharge" and "Honor All Cards" rules and prevent merchants from influencing consumers' payment decisions at the point

---

[3] Defendants, by filing a general motion to dismiss all of the opt-out complaints, have not moved to dismiss the Circuit City Plaintiffs' section 1 tying claims or any of their section 2 claims.

of sale. Compl. ¶¶ 1, 21(j), 43-52. During the Relevant Time Period, the Merchant Restraints prohibited merchants from steering customers toward less expensive payment methods, such as by adding a charge to reflect a more expensive payment card (surcharging), or selectively accepting payment cards that have lower acceptance costs (honoring some but not all cards). *Id.* In the absence of the No Surcharge and Honor All Cards rules, merchants such as the Circuit City Plaintiffs would have surcharged payment cards with higher interchange fees and rejected premium payment cards with higher interchange fees, which would have steered customers away from those payment cards and created downward pressure on interchange fees. *Id.* ¶¶ 47, 50. Instead, the Merchant Restraints insulated Visa and MasterCard from competition and ensured that interchange fees would remain at supracompetitive levels. *Id.* ¶¶ 42, 100, 106.

In this anticompetitive climate, Defendants' default interchange fees, which should have declined in a properly functioning market, were actually raised during the Relevant Time Period. *Id.* ¶ 37. Defendants' network rules required that merchants pay Issuing Banks an interchange fee, determined by uniform rate schedules, in every transaction involving a Visa or MasterCard payment card. *Id.* ¶¶ 19, 21(g). The Circuit City Plaintiffs did, in fact, pay Defendants' default interchange fees directly to the Issuing Banks. *Id.*; *see also* ¶¶ 5, 11. Defendants use the word "default" to falsely suggest that merchants were free to negotiate interchange fees with individual banks. In reality, merchants, including the Circuit City Plaintiffs, did not and could not independently negotiate interchange fees with Issuing Banks in an efficient and competitive manner. *Id.* ¶ 39. The Merchant Restraints precluded such agreements because the Issuing Banks had no incentive to compete for merchant acceptance.

To support and reinforce their Merchant Restraints, Defendants unlawfully tied and bundled together distinct products and services. *Id.* ¶ 54. Through the Honor All Cards rule, Defendants tied merchant acceptance of premium credit cards—distinct products that offer rewards and benefits to consumers but absolutely no benefit to merchants such as the Circuit City Plaintiffs—to merchant acceptance of non-premium credit cards. *Id.* ¶¶ 54-57. Additionally, Defendants used their market power in the market for Network Services to force

the Circuit City Plaintiffs and other merchants who accepted their payment cards to purchase services from them—such as payment-guarantee services—that could have been purchased from other vendors. *Id.* ¶¶ 58-61.

Finally, the complaints allege that Defendants' IPOs, which purported to change Visa and MasterCard from joint ventures to single entities incapable of conspiring under the antitrust laws, were intended to shield Visa and MasterCard from antitrust scrutiny. *Id.* ¶¶ 62, 69-71. However, neither Defendant's IPO eliminated its anticompetitive practices. Following their IPOs, Defendants' member banks continued to agree to abide by Defendants' rules, which still provided that the banks agree on the setting of default interchange fees, and that they continue enforcing the Merchant Restraints. *Id.* ¶¶ 72-76. Thus, despite Defendants' restructuring, their anticompetitive practices continued in effect, harming the Circuit City Plaintiffs and other merchants. Defendants' change in corporate governance merely changed the form—not the substance—of their conspiracy. *Id.* ¶ 77.

## ARGUMENT

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must accept all factual allegations as true and "construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff." *Anderson News, L.L.C. v. Am. Media*, 680 F.3d 162, 185 (2d Cir. 2012). To survive a motion to dismiss, a plaintiff need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The plausibility standard is not akin to a "probability requirement," but "simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of [the claim]." *Id.* at 556. "Because plausibility is a standard lower than probability, a given set of actions may well be subject to diverging interpretations, each of which is plausible." *Anderson News*, 680 F.3d at 184. "The choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion." *Id.* at 185.

## I. THE *VISA CHECK* RELEASE DOES NOT BAR PLAINTIFFS' CLAIMS

The Circuit City Plaintiffs incorporate by reference the argument on the *Visa Check* release made in the *7-Eleven* Plaintiffs' opposition to Defendants' motion to dismiss.

## II. THE CIRCUIT CITY PLAINTIFFS HAVE STANDING UNDER *ILLINOIS BRICK* TO BRING FEDERAL ANTITRUST CLAIMS FOR DAMAGES

Defendants argue that the opt-outs lack standing under the direct purchaser rule of *Illinois Brick* because the opt-outs do not (and cannot) allege that they were the direct payers of interchange fees. Defendants' argument fails at the outset because the Circuit City Plaintiffs allege that they, not the Acquiring Banks, directly paid interchange fees to the Issuing Banks. Moreover, even if the Acquiring Banks were the direct payers as Defendants contend, the Circuit City Plaintiffs allege that the banks were co-conspirators in Defendants' anticompetitive scheme, satisfying an exception to *Illinois Brick* or rendering it inapplicable.

### A. The Circuit City Plaintiffs Specifically Allege That They Directly Paid Interchange Fees

Defendant's argument under *Illinois Brick* should be rejected, first, because the Circuit City Plaintiffs allege that they were the direct payers of interchange fees, not the Acquiring Banks. The Circuit City Plaintiffs contend that they paid millions of dollars in interchange fees to Issuing Banks in order to accept Visa and MasterCard payment cards. *See, e.g.,* Compl. ¶¶ 5, 11, 19. Furthermore, the complaints define "interchange fee" as "the fee that *merchants pay* to the Issuing Bank to receive payment for each transaction in which the Issuing Bank's payment card is used." *Id.* ¶ 21(g) (emphasis added). These specific factual allegations—which must be accepted as true on a motion to dismiss—directly contradict Defendants' generic argument that "the opt-outs do not and cannot allege facts showing that they paid directly to card-issuing banks the interchange fees." Whether the Circuit City Plaintiffs and other merchants actually were the direct payers of interchange fees is a question of fact that is inappropriate for resolution now.

Defendants' out-of-context citation to a quote in Circuit City's complaint that "the Issuing Bank pays the Acquiring Bank the amount of the transaction minus the interchange fee,"

*see* Defs' Br. at 14, does nothing to disturb the above analysis. In fact, it is consistent with the Circuit City Plaintiffs' description of the payment card process, in which the Acquiring Bank pays nothing to the Issuing Bank, but rather, pays the merchant a sum less than the purchase price, which reflects the "merchant-discount fee." *See* Compl. ¶¶ 21(g), 32-33. It is also consistent with this Court's findings on two previous occasions that merchants directly pay interchange fees. First, in the Court's opinion partially granting summary judgment to the class plaintiffs in *Visa Check*, the Court held that "merchants are direct consumers of the defendants' debit card services and are directly injured by their allegedly anticompetitive conduct." 2003 WL 1712568, at *6. That injury—supracompetitive interchange fees that merchants paid to Issuing Banks—is of the same type as Plaintiffs allege here. Then, in *Temple v. Circuit City Stores, Inc.*, 2007 WL 2790154 (E.D.N.Y. Sep. 25, 2007), this Court dismissed claims by consumers against merchants that they paid higher prices resulting from Defendants' supracompetitive interchange fees, because the merchants were the direct purchasers harmed by supracompetitive interchange fees, not consumers. *Id.* at *5.

In addition, *Illinois Brick* is immaterial because the Circuit City Plaintiffs allege a more complex scheme than the mere collective fixing of interchange fees among horizontal competitors. The Circuit City Plaintiffs allege that Defendants adopted and enforced a series of Merchant Restraints, which "insulated Visa and MasterCard from competition and ensured that interchange fees would remain at supracompetitive levels." Compl. ¶¶ 42, 43-53. They also allege that Defendants' rules and procedures constituted the illegal tying of distinct products and services, *id.* ¶¶ 54-61, and allowed Defendants to monopolize or attempt to monopolize the markets for General Purpose Payment Cards and Network Services. *Id.* ¶¶ 1, 24-25. It is telling that Defendants themselves have alleged that their rules apply directly to merchants and specifically restrain the activities of merchants. *See generally* Compl., *Visa U.S.A., Inc. v. Wal-Mart Stores, Inc.*, Case No. 13-cv-03355; Compl., *Visa U.S.A., Inc. v. Nat'l Ass'n of Convenience Stores*, Case No. 05-md-01720.

Defendants' anticompetitive activities not only caused the Circuit City Plaintiffs to pay

excess interchange fees, they also inflicted other anticompetitive harms. For instance, Defendants barred Plaintiffs from purchasing Network Services from other vendors and from negotiating contracts directly with Issuing Banks that would favor acceptance of the Issuer's cards. The Circuit City Plaintiffs' harm therefore goes beyond the mere overpayment that was the focus of *Illinois Brick*. *See Law Offices of Curtis V. Trinko v. Atl. Corp.*, 305 F.3d 89, 106, 107 (2d Cir. 2002) ("*Illinois Brick* assumes a case where customers and customers of customers are only affected by the anticompetitive scheme through the imposition of prices higher than prices suffered in a competitive market" and does not apply where challenged actions had other anticompetitive effects), *rev'd on other grounds sub nom.*, 540 U.S. 398 (2004); *see also Chatham Brass Co. v. Honeywell*, 512 F. Supp. 108, 110 (S.D.N.Y. 1981) (rejecting application of *Illinois Brick* when plaintiff alleged "a conspiracy whose purpose and effect was to exclude it and other noncooperating distributors from favored purchaser status, in violation of antitrust laws"). As a result, Plaintiffs' allegations belie Defendants' argument under *Illinois Brick*.

### B.  *Illinois Brick* Does Not Bar Claims for Purchases Directly from a Co-Conspirator

The Circuit City Plaintiffs would have standing to bring damages claims under the federal antitrust laws even if discovery were to show that the Acquiring Banks, rather than merchants, paid interchange fees to the Issuing Banks. Defendants admit that *Illinois Brick* does not apply where there is a conspiracy between a supplier and intermediaries to impose an anticompetitive overcharge on the plaintiff who purchases from one of the intermediaries. While this is sometimes referred to as the "co-conspirator exception" to *Illinois Brick*, in reality, *Illinois Brick* is simply inapplicable where the plaintiff purchases directly from a co-conspirator who has agreed to impose an anticompetitive restraint on the plaintiff. *See, e.g., Arizona v. Shamrock Foods Co.*, 729 F.2d 1208, 1212-13 (9th Cir. 1984) ("Numerous other courts have found *Illinois Brick* inapplicable to claims against remote sellers when the plaintiffs allege that the sellers conspired with intermediates in the distribution chain to fix the price at which the plaintiffs purchased.") (collecting cases); *Lowell v. American Cyanamid Co..*, 177 F.3d 1228, 1230 (11th

Cir. 1999) ("*Illinois Brick* does not limit suits by consumers against a manufacturer who illegally contracted with its dealers" because "the consumer plaintiff is a direct purchaser from the dealer who … has conspired illegally with the manufacturer"); *Paper Sys. Inc. v. Nippon Paper Indus. Co.*, 281 F.3d 629, 631-32 (7th Cir. 2002) ("The right to sue middlemen that joined the conspiracy is sometimes referred to as a co-conspirator 'exception' to *Illinois Brick*, but it would be better to recognize that … *Illinois Brick* allocate[s] to the first non-conspirator in the distribution chain the right to collect 100% of the damages"); *Laumann v. Nat'l Hockey League*, 907 F. Supp. 2d 465, 482-83 (S.D.N.Y. 2012) (holding that *Illinois Brick* does not apply where plaintiffs purchase from co-conspirator middlemen).

The Circuit City Plaintiffs allege that the Acquiring Banks and Issuing Banks were participants in a conspiracy in which they, in combination with Visa and MasterCard, agreed to fix default interchange fees and impose anticompetitive restraints on merchants. *See* Compl. ¶¶ 16-20. They also allege that merchants, including the Circuit City Plaintiffs, had agreements with Acquiring Banks and Issuing Banks that Visa's and MasterCard's uniform schedule of interchange fees would apply to their transactions. *Id.*; *see also* ¶¶ 38-40. Thus, even if the Acquiring Banks paid the interchange fees and "passed on" those fees to Plaintiffs, *Illinois Brick* would not apply because the Acquiring Banks were co-conspirators with Defendants.

The cases cited by Defendants are markedly distinguishable. In *Paycom Billing Servs. v. MasterCard Int'l*, 467 F.3d 283, 292 (2d Cir. 2006), the court held that *Illinois Brick* barred the plaintiff's claims because the complaint expressly alleged that chargebacks, fines, and penalties were imposed by MasterCard and issuing banks on acquiring banks and "almost always" passed on to merchants. In *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1048-50 (9th Cir. 2008), the court could not find that the plaintiffs purchased from a co-conspirator because they had failed to plead sufficient facts to show "that the banks conspired or agreed with each other or with the Consortium." Finally, in *In re ATM Fee Antitrust Litig.*, 686 F.3d 741, 748-52 (9th Cir. 2012), the court found that the plaintiff cardholders conceded that their banks paid interchange fees and then passed those costs on to them in the form of foreign ATM fees. Significantly, while

859156.6     10

recognizing a "co-conspirator exception" to *Illinois Brick*, the court held that the plaintiffs had failed to allege that the banks conspired to fix the foreign ATM fees at issue. Here, Plaintiffs do allege that Visa's and MasterCard's member banks conspired with Visa and MasterCard to fix default interchange fees, and for that reason, Defendants' motion to dismiss under *Illinois Brick* should be denied.

### III. THE APPLICATION OF *BUFFALO BROADCASTING* IS PREMATURE AND, IN ANY EVENT, DOES NOT BAR PLAINTIFFS' CLAIMS

Defendants assert that the opt-outs' Section 1 claims concerning default interchange fees should be dismissed because Visa's and MasterCard's default interchange rules are not "restraints." They argue that because these default interchange rules allow the member banks to enter into bilateral agreements to supersede the rules, they do not restrain trade within the meaning of Section 1. As an initial matter, Defendants' argument, which relies heavily on *Buffalo Broadcasting*, is premature on a motion to dismiss. Moreover, the cases on which Defendants rely all emphasize that *realistically available alternatives* must exist to save a practice from being considered a "restraint." The Circuit City Plaintiffs' allegations that no realistically available alternatives existed to the payment of default interchange fees are more than sufficient to state a claim.

#### A. Defendants' Argument Is Improper on a Motion to Dismiss

Defendants' reliance on *Buffalo Broadcasting* is misplaced. *Buffalo Broadcasting* involved a unique product that had been the subject of decades of antitrust litigation—a blanket license that allowed media outlets to broadcast copyrighted music of members of ASCAP (the American Society of Composers, Authors, and Publishers). The blanket license was non-exclusive, and television stations had the right to purchase a different type of license from ASCAP (a program license), to negotiate directly with the artist (a direct license), or to license the music from a producer (a source license). 744 F.2d at 920-22. The blanket license was created by a consent decree with the U.S. government and had been previously upheld by the Second Circuit under a "rule of reason" analysis. *See CBS, Inc. v. ASCAP*, 620 F.2d 930 (2d Cir.

1980). Essential to the court's holding in *CBS* was the recognition that "the opportunity to acquire a pool of rights does not restrain trade *if an alternative opportunity to acquire individual rights is fully available*." *Id.* at 936 (emphasis added). *Buffalo Broadcasting* employed the same analysis to determine whether the blanket license had been proven by local television stations to be a restraint of trade. *See* 744 F.2d at 925-26 (identifying as the critical issue "whether the local television stations had proven that they lack, as a 'practical' matter, a 'real' alternative to the blanket license").

The Second Circuit in *Buffalo Broadcasting* held that because the local television stations had not "proven that there are no realistically available alternatives" to the blanket license, they "ha[d] not presented evidence … permitting a conclusion that the blanket license is a restraint of trade." *Id.* at 933. The court's holding—which came after trial on the merits in the district court—demonstrates the impropriety of Defendants' argument at this stage of the litigation. Defendants quote language from the Second Circuit's decision: "the initial and, as it turns out, dispositive issue *on the merits* is whether the [challenged conduct] has been *proven* to be a restraint of trade." Defs' Br. at 21 (quoting 744 F.2d at 924) (emphasis added). The court found that plaintiffs had failed to *show evidence* that there were no realistically available alternatives to the blanket license. 744 F.2d at 933. Questions of merits, proof, and evidence obviously have no place on a motion to dismiss. The "rule of reason" analysis employed by *Buffalo Broadcasting* can only be done after discovery has completed, because it is "fact-intensive" and requires "a careful weighing of the competitive effects of the agreement—both pro and con." *Geneva Pharms. Tech. Corp. v. Barr Labs. Inc.*, 386 F.3d 485, 507 (2d Cir. 2004). Indeed, many courts have recognized that the application of *Buffalo Broadcasting* is inappropriate on a motion to dismiss. *See, e.g., Meredith Co. v. SESAC LLC,* 2011 U.S. Dist. LEXIS 24517, *37, *43, *47 (S.D.N.Y. Mar. 8, 2011); *Broadcast Music, Inc. v. Hearst/ABC Viacom Ent. Servs.*, 746 F. Supp. 320, 326 (S.D.N.Y. 1990). Accordingly, Defendants' argument should be rejected as premature.

B.  **The Circuit City Plaintiffs Allege That There Were No Realistically Available Alternatives to the Payment of Defendants' Default Interchange Fees**

Even if Defendants' argument were timely, it fails because the Circuit City Plaintiffs allege that there were no practical alternatives to accepting Defendants' default interchange rules. The Circuit City Plaintiffs allege that "[d]uring the Relevant Time Period, Issuing Banks did not—and could not—independently negotiate interchange fees with merchants in an efficient and competitive manner." Compl. ¶ 39. They also allege that as a result of their market power, Visa and MasterCard were able to raise default interchange fees to supracompetitive levels "because many merchants, including Circuit City, believed that they could not refuse to accept Visa and MasterCard payment cards." *Id.* ¶ 25(a). Consequently, the Circuit City Plaintiffs allege that "Defendants' Merchant Restraints left Circuit City and other merchants with only one option to resist increasing interchange fees: refuse all Visa or MasterCard payment cards entirely, an option that was economically infeasible." *Id.* ¶ 52. These allegations expressly challenge the existence of realistically available alternatives that was essential to the courts' reasoning in *Buffalo Broadcasting* and related cases cited by Defendants. For example, in *Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 516 (4th Cir. 2002), the Fourth Circuit directed the lower court to hold further proceedings to determine whether Continental "may have come up with a fully effective alternative" to the carry-on baggage templates. In *Matsushita Elec. Indus. Co. v. Cinram Int'l, Inc.*, 299 F. Supp. 2d 370, 379 (D. Del. 2004), the court found that the plaintiff "realistically could avail itself of individual licenses" outside the patent pool. In *Fed. Paper Bd. Co. v. Amata*, 693 F. Supp. 1376, 1383-84 & n.9 (D. Conn. 1998), the court concluded that the alleged kickback agreement between the plaintiff's sales agent and its suppliers did not prevent the plaintiff from negotiating purchases directly with individual suppliers. And, in *Paycom*, 467 F.3d at 291-92, there was no agreement between the acquiring banks and issuing banks under which the acquiring banks had to assess chargebacks to merchants; merchants could negotiate directly with acquiring banks "to create an individualized solution" to their fraud costs. In contrast, the Circuit City Plaintiffs allege that there were no

realistically available alternatives to paying Defendants' default interchange fees.

Accordingly, Defendants' motion to dismiss on this ground must be denied.

## IV. DEFENDANTS' IPOS HAVE NO EFFECT ON PLAINTIFFS' CLAIMS FOR THE PERIOD SINCE EACH IPO

According to Defendants, their decision to reorganize themselves, during the pendency of antitrust litigation, into publicly traded corporations precludes the opt-outs' Section 1 claims for the period since each Defendant's IPO. To be clear, this argument does not challenge the Circuit City Plaintiffs' or any other opt-outs' claims for the period prior to each Defendant's IPO. For the portions of those claims that Defendants do challenge, Defendants' argument ignores Plaintiffs' allegations that: (1) neither Visa nor MasterCard withdrew from their pre-IPO conspiracies with their respective member banks; and (2) both Visa and MasterCard participated in post-IPO horizontal conspiracies with their respective member banks. For brevity's sake, the Circuit City Plaintiffs incorporate by reference the argument concerning Defendants' post-IPO conduct made in the *7-Eleven* Plaintiffs' opposition to Defendants' motion to dismiss.

## V. THE FILED-RATE DOCTRINE DOES NOT APPLY TO PLAINTIFFS' CLAIMS

The filed-rate doctrine is largely inapplicable to the Circuit City Plaintiffs' complaints for two reasons. First, the Circuit City Plaintiffs do not allege facts relating to the setting of debit interchange fees. Second, two of the Circuit City Plaintiffs—Circuit City and Borders—had filed for bankruptcy and stopped operating stores that accepted Visa and MasterCard prior to October 2011. To the extent Defendants' filed-rate argument applies to the other Circuit Plaintiffs, Plaintiffs incorporate by reference the argument made in the *Target* Plaintiffs' opposition.

## CONCLUSION

For all of the foregoing reasons, the Circuit City Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss.

DATED: May 5, 2014                **PEARSON, SIMON & WARSHAW, LLP**


By: */s/ Clifford H. Pearson*
          CLIFFORD H. PEARSON

CLIFFORD H. PEARSON (*pro hac vice*)
  cpearson@pswlaw.com
ALEXANDER R. SAFYAN (*pro hac vice*)
  asafyan@pswlaw.com
**PEARSON, SIMON & WARSHAW, LLP**
15165 Ventura Boulevard, Suite 400
Sherman Oaks, California 91403
Telephone: (818) 788-8300
Facsimile:  (818) 788-8104

BRUCE L. SIMON (*pro hac vice*)
  bsimon@pswlaw.com
AARON M. SHEANIN (*pro hac vice*)
  asheanin@pswlaw.com
**PEARSON, SIMON & WARSHAW, LLP**
44 Montgomery Street, Suite 2450
San Francisco, California 94104
Telephone: (415) 433 9000
Facsimile:  (415) 433 9008

*Attorneys for Plaintiffs in Siegel,* No. 13-cv-4581 (Circuit City); *Smith*, No. 13-cv-4582 (Borders); *Meta Advisors*, No. 13-cv-4583 (Deel); and *Performance Food Group*, No. 13-cv-4822 (PFG)

## CERTIFICATE OF SERVICE

I hereby certify that, on May 5, 2014, I caused to be electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will electronically send notification of such filing to the registered participants.


DATED:  May 5, 2014                                 */s/ Clifford H. Pearson*

                                                                                         CLIFFORD H. PEARSON