**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION<br><br>This Document Relates to: | Case No.   14-MD-01720 (JG) (JO) |
| WAL-MART STORES, INC., WAL-MART STORES TEXAS, LLC, WAL-MART STORES EAST, LP, WAL-MART STORES EAST, LLC, WAL-MART LOUISIANA, LLC, WAL-MART STORES ARKANSAS, LLC, SAM'S WEST, INC., SAM'S EAST, INC., WAL-MART.COM USA, LLC, VUDU, INC., INKIRU, INC., OZARK SPIRITS, LLC, GREEN RIVER SPIRITS, LLC, and QUALITY LICENSING CORP.,<br><br>                Plaintiffs,<br>    v.<br><br>VISA U.S.A. INC., VISA INC., VISA INTERNATIONAL SERVICE ASSOCIATION, VISA EUROPE LIMITED and VISA EUROPE SERVICES INC.,<br><br>                Defendants. | Case No.   14-CV-2318 (JG) (JO) |

## FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL

COME NOW Plaintiffs Wal-Mart Stores, Inc., Wal-Mart Stores Texas, LLC, Wal-Mart Stores East, LP, Wal-Mart Stores East, LLC, Wal-Mart Louisiana, LLC, Wal-Mart Stores Arkansas, LLC, Sam's West, Inc., Sam's East, Inc., Wal-Mart.com USA, LLC, Vudu, Inc., Inkiru, Inc., Ozark Spirits, LLC, Green River Spirits, LLC and Quality Licensing Corp. (collectively "Wal-Mart") by and through their undersigned attorneys, and for their Complaint against Defendants Visa U.S.A. Inc., Visa Inc., Visa International Service Association, Visa

Europe Limited, and Visa Europe Services Inc. (collectively "Visa" or "Defendants") allege as follows:

## INTRODUCTION

1.      Wal-Mart brings this action pursuant to federal and state antitrust laws in order to recover damages for anticompetitive conduct by Defendants.  As alleged herein, Visa has engaged in a conspiracy with some of the nation's largest banks to illegally fix the Interchange Fees and inflate the Network Fees that Wal-Mart and other merchants pay on Visa charge card transactions.  Visa and the banks have also conspired to enact rules that prevent Wal-Mart and other merchants from protecting themselves against those fees.  The contracts, combinations, conspiracies, and understandings entered into by Visa and the banks harm competition and impose prices upon Wal-Mart above what could have been sustained in a competitive market in the Relevant Markets defined herein.  Visa has also engaged in other anticompetitive conduct as described herein.  This conduct has caused Wal-Mart to suffer enormous damages during the Damages Period (January 1, 2004, through November 27, 2012).

2.      As described herein, the banks have schemed to not compete with one another for merchant acceptance of their Visa General Purpose Payment Cards.

3.      The agreements not to compete and price-fixing schemes of Defendants and the banks are restraints of trade and *per se* violations of Section 1 of the Sherman Act.

4.      Defendants have engaged in illegal monopolization under Section 2 of the Sherman Act through the use of Anti-Steering Restraints and other exclusionary practices.

5.      Wal-Mart's claims are limited to past damages in light of the injunction in the Class Settlement Order and Final Judgment in *In re Payment Card Interchange Fee and Merchant Discount Antitrust Litigation*, No. 05-md-1720(JG)(JO) (E.D.N.Y.) ("MDL 1720"),

2

despite the fact that Wal-Mart believes the anticompetitive conduct described herein continues to inflict damages on Wal-Mart and its customers.  Wal-Mart respectfully maintains that said injunction, like other aspects of the class settlement in MDL 1720, is erroneous and improper; and Wal-Mart has appealed from the Class Settlement Order and Final Judgment, which approved the settlement over the objection of Wal-Mart and many other merchants.

6.     None of Defendants' anticompetitive rules and practices was reasonably necessary for the functioning of a General Purpose Payment Card Network.  Any benefits that Defendants claim are achieved by these restraints of trade can be accomplished by means that are less harmful to competition.  Even if these restraints have any competitive benefit, their anticompetitive effects vastly outweigh any such benefit.

7.     During the Damages Period, Defendants imposed Interchange Fees and Network Fees estimated at more than $350 billion on merchants and consumers in the United States.  Wal-Mart, the largest retail merchant in the United States, has suffered anticompetitive harm along with its customers due to Defendants' price fixing and other anticompetitive conduct.

8.     Defendants' anticompetitive conduct has injured consumers by limiting competition in the General Purpose Payment Card markets.  This has deprived market participants of lower prices as well as innovation, new payment options, and cost-saving approaches (*e.g.*, to reduce fraud) that would have substantially benefited both U.S. merchants and consumers.

## JURISDICTION AND VENUE

9.     This complaint is filed under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and/or restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and for damages under Section 4 of the Clayton Act, 15 U.S.C. § 15.  The Court has jurisdiction

over the federal antitrust law claims alleged herein under 28 U.S.C. §§ 1331, 1337, 2201 and

2202.  The Court has supplemental jurisdiction over the state antitrust and unfair competition law

claims alleged herein under 28 U.S.C. § 1367.

10.     Venue is proper in this District under 28 U.S.C. § 1391 and 15 U.S.C. §§ 15, 22

and 26.  Defendants are subject to personal jurisdiction in this District and should reasonably

expect to be haled into court in this District due to the acts alleged herein.  The acts complained

of have had, and will have, substantial anticompetitive effects in the District.

## DEFINITIONS

11.     The following terms are used in this Complaint:

a.  "Acquirer" means a bank or other financial institution that has been authorized by a
General Purpose Payment Card Network to enter into agreements with merchants that
enable those merchants to accept General Purpose Payment Cards for the purchase of
goods and services. Acquirers authorized by the Visa General Purpose Payment Card
Networks to acquire Visa-branded General Purpose Payment Card transactions are
members or agents of those networks.

b.  "Charge Card" is a General Purpose Credit Card for which the cardholder is required,
under most circumstances, to pay the card balance in full each month.

c.  "Damages Period" means the period from January 1, 2004 to November 27, 2012.

d.  "General Purpose Credit Card" during the Damages Period means a plastic card or other
form factor, such as a key fob, usually provided by an Issuer, that allows cardholders to
pay for goods and services at a large number of diverse merchants by accessing a line of
credit extended to the cardholder by the Issuer.  Examples of General Purpose Credit
Cards are the Visa credit cards issued by banks, as well as certain Visa corporate cards.
General Purpose Credit Cards also include Charge Cards.

e.  "General Purpose Credit Card Network Services" means the services and infrastructure
that a network and its members require merchants to use in order to accept General
Purpose Credit Cards and through which General Purpose Credit Card transactions are
conducted, including authorization, clearance, and settlement.

f.  "General Purpose Debit Card" during the Damages Period means a plastic card or other
form factor, such as a key fob, provided by an Issuer that allows cardholders to pay for
goods and services at a large number of diverse merchants by accessing an asset account,
typically the cardholder's demand deposit account ("DDA"), at a bank or other financial

institution. Visa's Signature Debit Card program (the "Visa Check Card") is a General Purpose Debit Card, as are PIN Debit Cards authorized over Visa's Interlink network. Per Visa's operating rules, General Purpose Debit Cards also include prepaid cards, which access asset accounts other than the cardholder's DDA. Examples include, but are not limited to, payroll cards and cards associated with a flexible spending account, health reimbursement arrangement, or health savings account.

g.  "General Purpose Debit Card Network Services" means the services and infrastructure that a network and its members require merchants to use in order to accept General Purpose Debit Cards and through which General Purpose Debit Card transactions are conducted, including authorization, clearance, and settlement.

h.  "General Purpose Payment Card" means a General Purpose Credit Card or a General Purpose Debit Card.

i.  "General Purpose Payment Card Network" means an electronic payment system used to accept, transmit or process transactions made by General Purpose Payment Cards for money, goods or services and to transfer information and funds among Issuers, Acquirers, merchants and users of General Purpose Payment Cards. Visa operates multiple General Purpose Payment Card Networks.

j.  "Honor All Issuers" rules are Visa rules that require that any merchant that accepts any one bank's General Purpose Credit (or Debit) Cards issued over that network must accept all other banks' General Purpose Credit (or Debit) Cards that carry the brand of that network.

k.  "Honor All Cards" rules are rules of Visa that require any merchant that accepts Visa-branded General Purpose Credit Cards to accept all Visa-branded cards that Visa considers to be General Purpose Credit Cards, and the rules of Visa that require any merchant that accepts Visa-branded General Purpose Debit Cards to accept all Visa-branded cards that Visa considers to be General Purpose Debit Cards.

l.  "Interchange Fees" are fees or rates fixed by Visa and its member banks that are paid to Issuers by merchants in conjunction with transactions in which Visa General Purpose Payment Cards are used as a means of payment for purchases of goods and services. Interchange Fees are deducted by an Issuer from the funds owed to a merchant prior to the settlement of a Visa General Purpose Payment Card transaction.

m.  "Issuer" means a bank or other financial institution that issues General Purpose Payment Cards to consumers (including business employees) to pay for goods and services at merchant locations. Issuers authorized by the Visa General Purpose Payment Card Networks to issue Visa-branded General Purpose Payment Cards are members of those networks.

n.  "Network Fees" are fees or rates fixed by Visa that are paid to Visa by merchants in conjunction with transactions in which Visa General Purpose Payment Cards are used as

a means of payment for purchases of goods and services. Network Fees are deducted by Visa from the funds owed to a merchant prior to the settlement of a Visa General Purpose Payment Card transaction.

o.  "PIN Debit Card" means a General Purpose Debit Card with which the cardholder authorizes a withdrawal from his or her bank account usually by presenting his or her card at the point-of-sale and entering a personal identification number ("PIN"). Visa's Interlink network is a PIN Debit Card network.  A PIN Debit Card might also allow for signature authentication of the cardholder or no cardholder authentication at all.

p.  "Premium Payment Card" means a General Purpose Credit Card that carries a higher Interchange Fee than standard General Purpose Credit Cards and is required by a network to provide a certain level of rewards or incentives to the cardholder. The "Visa Signature Preferred Card" product is an example of a Premium Payment Card.

q.  "Signature Debit Card" means a General Purpose Debit Card with which the cardholder authorizes a withdrawal from his or her bank account usually by presenting the card at the point-of-sale and signing a receipt or point-of-sale terminal.  Signature Debit Card transactions are processed in the same way as General Purpose Credit Card transactions. Examples of Signature Debit Cards include the "Visa Check Card" product. A Signature Debit Card might also allow for PIN authentication of the cardholder or no cardholder authentication at all.

## PARTIES

### A.    Plaintiffs

12.    Plaintiff Wal-Mart Stores Inc. is a Delaware corporation with offices in Bentonville, Arkansas.

13.    Plaintiff Wal-Mart Stores Texas, LLC is a Delaware limited liability company with offices in Bentonville, Arkansas; and for purposes of this action it is successor in interest to Wal-Mart Stores Texas, LP.

14.    Plaintiff Wal-Mart Stores East, LP is a Delaware limited partnership with offices in Bentonville, Arkansas.

15.    Plaintiff Wal-Mart Stores East, LLC is an Arkansas limited liability company with offices in Bentonville, Arkansas; and for purposes of this action it is successor in interest to Wal-Mart Stores East, Inc.

6

16.     Plaintiff Wal-Mart Louisiana, LLC is a Delaware limited liability company with offices in Bentonville, Arkansas.

17.     Plaintiff Wal-Mart Stores Arkansas, LLC is an Arkansas limited liability company with offices in Bentonville, Arkansas.

18.     Plaintiff Sam's West, Inc. is an Arkansas corporation with offices in Bentonville, Arkansas.

19.     Plaintiff Sam's East, Inc. is an Arkansas corporation with offices in Bentonville, Arkansas.

20.     Plaintiff Wal-Mart.com USA, LLC is a California limited liability company with offices in San Bruno, California and Bentonville, Arkansas.

21.     Plaintiff Vudu, Inc. is a Delaware corporation with offices in Sunnyvale, California and Bentonville, Arkansas.

22.     Plaintiff Inkiru, Inc. is a Delaware corporation with offices in Sunnyvale, California and Bentonville, Arkansas.

23.     Plaintiff Ozark Spirits, LLC is a North Dakota limited liability company with offices in Bismarck, North Dakota and Bentonville, Arkansas.

24.     Plaintiff Green River Spirits, LLC is a Kentucky limited liability company with offices in Bentonville, Arkansas.

25.     Plaintiff Quality Licensing Corp. is a Texas corporation with offices in Bentonville, Arkansas.

26.     Plaintiffs accepted Visa General Purpose Payment Cards during the Damages Period and were injured in their business or property as a result of the unlawful conduct alleged in this Complaint.

27.     Plaintiffs have timely opted out of the proposed class settlement in MDL 1720 and are seeking to recover on behalf of themselves the damages incurred as a result of the conduct detailed in this Complaint, including by any subsidiaries and/or affiliates that operate in the United States.

**B.      Defendants**

28.     Defendant Visa Inc. is a publicly-traded Delaware corporation, with its principal place of business in Foster City, California.

29.     Defendants Visa U.S.A. ("Visa U.S.A.") and Visa International Service Association ("Visa International") are wholly owned subsidiaries of Visa Inc.

30.     Defendant Visa Europe Limited is a private limited liability company incorporated in the United Kingdom under the Companies Act 2006.  Visa Europe Limited has its principal place of business in the United Kingdom.  Visa Europe Limited is an association of over 3,000 European banks. 'Visa Europe Limited is owned by its member banks.

31.     Defendant Visa Europe Services Inc. is a Delaware corporation, with its principal place of business in the United Kingdom.

32.     Defendant Visa Europe Services Inc. is and has been a wholly owned subsidiary of Visa Europe Limited at all times since July 1, 2004.  On that date, Visa Europe Services Inc. acquired the assets, liabilities and business of the EU operations of Defendant Visa International Service Association.

33.     Defendants Visa Europe Limited and Visa Europe Services Inc. are sued due to the effects of their rules on Interchange Fees charged and paid in the United States.

34.     Visa Inc., Visa U.S.A., Visa International, Visa Europe Limited and Visa Europe Services Inc. are collectively referred to herein as "Visa."

8

35.     Visa operated General Purpose Payment Card Networks throughout the Damages Period and continues to do so today.

36.     Various banks are members of Visa's General Purpose Payment Card networks and have conspired with one another and with Visa not to compete for merchants' acceptance of General Purpose Payment Cards, to require the payment of an Interchange Fee and Network Fee on every Visa transaction, and to fix the level of Interchange Fees and inflate the level of Network Fees that they charge to Wal-Mart and other merchants.

## FACTUAL ALLEGATIONS

### A.     Visa's Initial Public Offering

37.     On March 19, 2008, Visa Inc. conducted an initial public offering through which it offered ownership shares to the general public and also issued ownership shares to its member banks.  Upon the restructuring, Visa U.S.A. and Visa International became wholly owned subsidiaries of Visa Inc. and they continue to operate as such today.

38.     Visa's IPO has left the anticompetitive conduct intact.  Visa and the banks continue to agree to fix the prices of Interchange Fees through the default Interchange Fee schedules and through Visa's rules, including the Honor All Issuers rules.

39.     Prior to the Visa IPO in March, 2008, Visa U.S.A. operated as a nonstock, nonassessable Delaware membership corporation with its principal place of business in Foster City, California.  Its owners/members included approximately 14,000 banks.

40.     Prior to the Visa IPO, Visa International operated as a nonstock, nonassessable Delaware membership corporation with its principal place of business in Foster City, California. Its owner/members included approximately 21,000 banks.

41.     Prior to the Visa IPO, Visa U.S.A. and Visa International were each governed by a board of directors comprised of bank executives selected from their member banks. Visa International had regional boards of directors for each of its geographical regions. Visa U.S.A. also was a regional group member of Visa International.

42.     Despite Visa's IPO, the banks controlled every aspect of Visa's business throughout the Damages Period by virtue of their status as Visa board members and/or as Visa owner/members. This control included the banks' agreements: (1) not to compete with one another for merchants' acceptance of Visa General Purpose Payment Cards; (2) to fix the Interchange Fees for Visa General Purpose Payment Card transactions in furtherance of their agreement not to compete; and (3) to establish and enforce Visa's rules, including all the rules detailed in this Complaint.

**B.      The Rules that Underpin Defendants' Anticompetitive Agreements.**

43.     The scheme of Visa and the banks to not compete and to fix prices relies on rules such as the Honor All Issuers rules, the default Interchange Fee rules, and other rules and policies that establish mechanisms for monitoring and enforcing these price-fixing schemes. These Rules bind all Visa Issuers and Acquirers.

44.     Visa's Honor All Issuers rules require that any merchant that accepts any one bank's General Purpose Credit (or Debit) Cards issued over that network must accept all other banks' General Purpose Credit (or Debit) Cards that carry the brand of that network. These "all or nothing" rules thereby constitute agreements among the banks not to compete for merchants' acceptance of their General Purpose Credit (or Debit) Cards.

45.     Visa's default Interchange Fee rules constitute an agreement not to compete for merchant acceptance because they enable Visa to fix the Interchange Fees and Network Fees it

10

charges merchants on every transaction. There is no competition because merchants are prevented from realizing the price-reducing benefits that would result if Issuers competed on price. Instead, merchants accepting a given type of Visa General Purpose Payment Cards pay the same Interchange Fee on a given transaction regardless of which Issuer is involved.[1] The banks compete in many aspects of their business, but in these markets they charge merchants exactly the same inflated prices pursuant to the default Interchange Fee rules, and agree to only allow merchants to accept their cards if the merchant also accepts the cards issued by their competitors. While Wal-Mart has had limited success in negotiating rates that are lower than the default Interchange Fees, these rates are still far in excess of the amount Wal-Mart would have paid but for the existence of Visa's anti-competitive, collusive practices.

46. Visa has maintained that operating multiple Interchange Fee structures for different issuing banks is impractical. However, Visa does just that for General Purpose Debit Card Interchange Fees. Since October 1, 2011 Visa has operated both its Visa signature debit network, as well as its Interlink PIN Debit Network with Interchange Fees that are different for large issuing banks than the Interchange Fees paid by merchants to smaller issuing banks. Nothing would prevent Visa from supporting this same functionality more broadly in the General Purpose Debit Card market or in the General Purpose Credit Card market.

47. Visa's Honor All Issuers rules and default Interchange Fee rules have enabled it to acquire and maintain its substantial market power. Specifically, Visa incentivizes Issuers to issue Visa General Purpose Payment Cards through the use of Interchange Fees above what could have been sustained in a market in which issuers compete for merchant acceptance. Merchants are effectively compelled to accept Visa's cards for payment. Visa has maintained its

---

[1] The one exception to this general rule is the bifurcation of debit card interchange into so-called "Regulated" and "Exempt" depending on the size of the issuers. This distinction came about as a result of the Federal Reserve's promulgation of Regulation II, which limits debit card Interchange Fees for large financial institutions.

substantial market power through its rules, and has used that power to force merchants to pay supracompetitive Interchange Fees and Network Fees.

48.     Visa and the banks have also engaged in anticompetitive conduct in the General Purpose Debit Card market by improperly tying products within the debit category by means of the Honor All Cards rule.  They have, for example, treated prepaid cards and flexible spending account (FSA) cards as debit cards and have forced Wal-Mart and other merchants that accept Visa's ordinary debit cards to accept prepaid and FSA cards (and vice versa).  Prepaid, FSA, and certain other cards are distinct products that cannot be tied to debit.

49.     Visa's anticompetitive conduct has enabled it to set both General Purpose Credit Card and Debit Card Interchange Fees at levels above what could have been sustained in a competitive market.  Visa's anticompetitive conduct generated more than $350 billion in Interchange Fees for the colluding Issuers during the Damages Period—fees paid in part by Wal-Mart and its customers.  Wal-Mart paid these anticompetitive fees directly throughout the Damages Period and it continues to pay them today.

50.     Visa's anticompetitive conduct during the Damages Period was not reasonably necessary to operate their General Purpose Payment Card Networks.  Domestic and international examples have demonstrated that Interchange Fees are not necessary to encourage Issuers to issue General Purpose Payment Cards or for these payment systems to function.  Interchange Fees are unjustifiable.

        **1.**      **During the Damages Period, Visa facilitated a horizontal conspiracy of its member banks.**

51.     During the Damages Period, co-conspiring Visa member banks ratified the default Interchange Fee schedules that were recommended by staff and consultants of Visa.

52.     During the Damages Period, more banks joined Visa and willingly agreed to abide by restrictive covenants forbidding Issuer competition and requiring Issuers to accept centrally-fixed prices, thus expanding the conspiracy.

53.     The banks added products such as Visa Signature and Signature Preferred Cards. These new, high Interchange Fee products further expanded the conspiracy.

### 2.     The Honor All Issuers rules constituted unjustifiable horizontal agreements not to compete on price.

54.     The Honor All Issuers rules require a merchant to accept all of a network's Issuers' General Purpose Credit (or all Debit) Cards bearing the network's brand if that merchant accepts any single Issuer's General Purpose Credit (or Debit) Cards bearing the network's brand, regardless of the Issuer.  In approving the Honor All Issuers rules, the banks on Visa's governing boards of directors eliminated any incentive for Issuers to compete for merchant acceptance based on the price of interchange, as they would have done in a competitive market.  *See, e.g.,* Visa Rule 5.2.B, *Visa U.S.A. Inc. Operating Regulations, Volume 1— General Rules* (Nov. 15, 2008).  In the absence of the Honor All Issuers rules, it would have been in the economic interest of an individual Issuer to lower the price it charged in order to compete for merchants' business against other banks issuing similar General Purpose Payment Cards.  These rules also prohibit merchants from steering consumers from using one Issuer's Visa General Purpose Payment Cards to using General Purpose Payment Cards issued by other Issuers or other cheaper forms of payment.

55.     Even if, counterfactually, the Honor All Issuers rules have some legitimate rationale, those objectives could be realized through less restrictive means.

### 3.   Default Interchange Fee rules are unlawful horizontal agreements.

56.   Visa requires that a default Interchange Fee apply to every transaction for which the Issuer and Acquirer has not entered into a separate, individually-negotiated agreement regarding fees. *See, e.g.*, Visa Rule 9.5, *Visa U.S.A. Inc. Operating Regulations, Volume 1— General Rules* (Nov. 15, 2008). The default Interchange Fee rules allowed Visa to fix the Interchange Fees paid by merchants.

57.   The Honor All Issuers rules, together with the default Interchange Fee rules, eliminated any incentive for Issuers to charge fees below the artificially high levels being fixed by the conspiracies. Competition among Issuers would have motivated rival Issuers to charge lower fees than the default Interchange Fees to obtain and maintain merchant acceptance.

58.   Some Visa-issuing banks willingly agree to restrictive covenants requiring all Issuers and Acquirers to adhere to all network rules. *See, e.g.*, Visa Rule 1.2.A, *Visa U.S.A. Inc. Operating Regulations, Volume 1—General Rules* (Nov. 15, 2008). Member banks that violated any of these network rules were subject to fines and even expulsion from Visa and, by rule, the network could not be held liable by these banks. *See, e.g.*, Visa Rule 1.7, *Visa U.S.A. Inc. Operating Regulations, Volume 1—General Rules* (Nov. 15, 2008); Visa Core Principles 1, 2.3, *Visa International Operating Regulations* (Oct. 15, 2010). This enabled Visa to monitor compliance with, and enforce, the rules of its cartel. These rules remain in place today.

59.   Visa also has promulgated a No Bypass rule, which prohibits merchants and banks from bypassing the Visa system in order to clear, authorize, or settle transactions. The default Interchange Fee rules and the Honor All Issuers rules, combined with Visa's No Bypass Rule and the size and market power of Visa and MasterCard, restrained banks from entering into

14

bilateral agreements to supersede those rules or to compete outside the Visa or MasterCard networks.

60.    Upon information and belief, no Visa-issuing bank has challenged the imposition of these rules in court or otherwise.  Instead, the banks have maintained the conspiracy.

61.    Despite there being different fees within a given default Interchange Fee schedule, every Issuer applied the same fee schedule to a given type of card and transaction.[2]  This collusion by every Issuer to set and accept identical default Interchange Fee schedules constitutes price fixing.

62.    Wal-Mart and other merchants pay Interchange Fees directly.  When a merchant accepts a Visa General Purpose Payment Card as payment for a transaction, that merchant is the direct purchaser of General Purpose Payment Card Network Services and directly pays the Interchange Fees associated with that transaction.  The Issuer directly deducts the Interchange Fee from the net transaction amount passed through to the merchant.  Issuers account for Interchange Fees as revenue, and merchants account for Interchange Fees as an expense.

### 4.    Visa has used its price-fixing schemes to establish, maintain, and enhance its long-held market power.

63.    Visa acquired substantial market power in the General Purpose Payment Card markets through the use of price fixing to induce Issuers to join the network.

64.    Visa's substantial market power has persisted throughout the Damages Period and remains intact today.  *See In re Visa Check/Mastermoney Antitrust Litig.*, 96-CV-5238 (JG), 2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003) ("*Visa Check*") (finding Visa possessed market power in both the credit card and debit card markets); *see also* Brief for the United States, *United*

---

[2] The one exception to this general rule is the bifurcation of debit card interchange into so-called "Regulated" and "Exempt" depending on the size of the issuers.  This distinction came about as a result of the Federal Reserve's promulgation of Regulation II, which limits debit card Interchange Fees for large financial institutions.

*States v. Visa U.S.A. Inc., et al.*, No. 02-6074(L) (2nd Cir. Aug. 30, 2002) (asserting the position
of the Department of Justice that Visa possesses market power) (available at
http://www.justice.gov/atr/cases/f11700/11793.htm).

65.     Visa charges differing Interchange Fees based, in part, on its determination of the
degree to which a given merchant category needs to accept general purpose cards.  This price
discrimination persisted throughout the Damages Period and continues today.

66.     During the damages period, and subsequent to the *Visa Check* finding that Visa
possessed market power in the General Purpose Debit Card market, Visa's market share in the
General Purpose Debit Card market increased significantly, further bolstering its market power.

67.     These determinations that Visa possessed substantial market power were correct
and are further supported by direct evidence of that market power.  That evidence includes: (1)
Visa's ability to raise Interchange Fees and Network Fees without the loss of merchant
acceptance or transaction volume; (2) successful price discrimination such as the price
discrimination described above; (3) setting Interchange Fees and Network Fees unrelated to
costs; (4) the ability to enforce anticompetitive policies; and (5) forcing merchants and
consumers to accept inferior products—including products that are susceptible to fraud.

68.     Visa's ability to increase Interchange Fees and Network Fees without losing
merchant acceptance or transaction volume directly evidences its monopoly power in the General
Purpose Debit Card market.

69.     Visa did not set Interchange Fees or Network Fees based upon cost, as it would
have done in a competitive market.  Visa's ability to succeed in this conduct and profit from this
price-fixing conspiracy is additional direct evidence of its substantial market power.

70.     Visa's substantial market power in the General Purpose Payment Card market is further evidenced by its successful enforcement of anticompetitive rules and policies that harmed merchants without losing merchant acceptance or transaction volume.

71.     Visa has long recognized that the magnetic stripe technology that its General Purpose Credit Card and Signature Debit Card networks utilize is inherently insecure and fraud-prone.  Yet, Visa has shifted most of the cost of fraud losses to merchants in this country through the implementation of various compliance programs and liability rules.  Its success in forcing merchants and consumers to accept and use technologically-inferior and fraud-prone products is further evidence of its substantial market power.  To the extent Wal-Mart was forced to absorb the costs of such fraud through chargebacks or fees or fines as well as costly PCI compliance requirements that necessitate the creation and operation of secure data storage environments and encryption algorithms, such costs are damages that flow from the conspiracy.

72.     Even though Wal-Mart is the largest merchant in the country, once it had implemented widespread acceptance of Visa General Purpose Credit and Debit Cards, discontinuing such acceptance would result in an unacceptable decrease in sales.  This is further evidence that Visa's substantial market power continued, and even increased, during the Damages Period.

### 5.     Visa's price-fixing schemes are anticompetitive and unreasonable vertical price restraints.

73.     The Interchange Fee price-fixing schemes adopted by Visa constitute anticompetitive and unreasonable vertical price restraints.  Visa entered into express vertical agreements with each of its member banks, binding all of its member banks to comply with the rules and regulations of the network, including the rules at issue in this Complaint.  In turn, Visa

holds issuing and acquiring members responsible for compliance with the rules. These vertical restraints continued in full effect during the Damages Period, including after Visa's IPO.

      **C.**      **Visa's Interchange Fee Cartel is a Naked Restraint of Trade Without Justification.**

      74.      Interchange Fees offer no procompetitive justification to offset the anticompetitive harm caused by the conduct detailed in this Complaint. Indeed, General Purpose Payment Card systems have functioned successfully without Interchange Fees in the United States and internationally. Moreover, the Interchange Fees set by Visa are not based on cost.

      75.      General Purpose Debit Card Interchange Fees for regulated banks declined significantly beginning in late 2011. Despite this, General Purpose Debit Card issuance continues to be profitable and debit volumes have increased. This further supports the conclusion that General Purpose Debit Card Interchange Fees have been fixed at levels above what could have been sustained in a competitive market throughout the Damages Period.

      76.      Interchange Fees are unnecessary to encourage General Purpose Credit Card issuance because General Purpose Credit Card Issuers already earn substantial profits from interest rates on revolving balances and cardholder fees.

      77.      The costs associated with issuing Visa General Purpose Credit Cards have declined dramatically since 1990 due to savings from substantial decreases in card production, processing, and telecommunications costs, as well as through economies of scale that have resulted from vastly-increased transaction volumes and concentration of card issuance through bank mergers and card portfolio acquisitions.

      78.      Notwithstanding these declines in Issuer costs, Visa has substantially raised its default Interchange Fees. For example, Visa has raised the Interchange Fees, Network Fees and/or cost of acceptance that apply to Visa General Purpose Credit Card transactions throughout

18

the Damages Period for Wal-Mart. This demonstrates that Interchange Fees and Network Fees are not based on costs, but rather are an anticompetitive exercise of market power.

**D.      Visa's Supracompetitive Network Fees.**

79.      Visa's Honor All Issuers rule, Honor All Cards rule, and default Interchange Fee rules have enabled Visa to acquire and maintain its substantial market power. This market power has allowed Visa to charge supracompetitive Network Fees, harming Wal-Mart.

80.      Visa's ability to provide supracompetitive, unjustifiable Interchange Fees to its issuing banks allowed Visa to build its market power, resulting in an ability to charge merchants supracompetitive Network Fees.

81.      In addition to the direct costs Wal-Mart incurred as a result of these supracompetitive Network Fees, to the extent Wal-Mart was forced to pass these costs through to its consumers in the form of higher retail prices, Wal-Mart suffered lost sales as a result.

82.      Visa's anti-steering rules prevented merchants from steering customers to less expensive networks, resulting in the payment of Network Fees for Visa General Purpose Payment Card Transactions that Wal-Mart would not have paid had the transactions been processed by different, less expensive, networks.

83.      Visa's exclusive arrangements with issuers further inhibited competition, particularly in the market for General Purpose Debit Card Network Services. By incentivizing its member banks to exclude competitive networks from debit cards, Visa established and added to its market power in the General Purpose Debit Card Network Services market. As a result of this increased market power, Visa reinforced its ability to charge supracompetitive Network Fees.

84.     In response to federal regulations requiring the presence of a competitive network on every debit card, Visa implemented a fixed Network Fee, which it called the "Fixed Acquirer Network Fee" (FANF).

85.     The FANF is designed to protect Visa's supracompetitive Network Fee income by tying the Network Fees associated with General Purpose Debit Card acceptance to the Network Fees Associated with General Purpose Credit Card acceptance.

86.     Merchants who are subject to the FANF must pay the fee, regardless of whether they send Visa even a single transaction.

87.     Upon information and belief, the FANF is reduced by 25% for merchants who decline to accept either Visa General Purpose Debit Cards or Visa General Purpose Credit Cards. This means the FANF amounts to a financial tie of acceptance of General Purpose Debit Cards and General Purpose Credit Cards.

88.     Networks in other markets operated successfully with Network Fees that are far lower than those charged by Visa.  Canada's largest debit network, Interac, for example, charges merchants less than one cent per transaction.

**E.     Anti-steering rules hid the costs of Visa transactions from consumers, thereby inhibiting competition from other networks.**

89.     Visa has prevented Wal-Mart and other merchants from using financial incentives and marketing to steer customers to other networks or forms of payment, and has thus engaged in anticompetitive behavior.  During the damages period, Visa's anti-steering rules prohibited Wal-Mart and other merchants from making the cost of Visa transactions transparent to consumers and from making consumers who use the cards bear the associated costs.

90.     During the Damages Period, the anti-steering rules included Visa's rules that prohibited Wal-Mart and other merchants from offering discounts to consumers who used

20

General Purpose Payment Cards that were less expensive than Visa General Purpose Payment Cards.

91.     These anti-steering rules remained in effect until Visa revised them to permit such discounting pursuant to a July 20, 2011 consent decree it entered into with the Department of Justice Antitrust Division.  However, Visa still prohibits merchants from offering discounts that encourage consumers to use cheaper forms of payment, including one bank's Visa General Purpose Payment Cards instead of more expensive Visa General Purpose Payment Cards issued by other banks.  Such discounting by a Visa Issuer would force Visa member banks to compete for merchant acceptance.  The anti-steering rules also included Visa's prohibition against merchants surcharging Visa transactions.

92.     Visa's previous no-surcharge rule (*see, e.g.*, Rule 5.2.F, *Visa U.S.A. Inc. Operating Regulations, Volume 1—General Rules* (Nov. 15, 2008)) provided that "[a] Merchant must not . . . [a]dd any surcharge to [t]ransactions."  Visa modified these rules under the proposed settlement in MDL 1720 to permit surcharging of Visa General Purpose Credit Card transactions in limited circumstances effective January 27, 2013.  However, the no-surcharging rules remain in place for Visa General Purpose Debit Card transactions.

93.     There were no procompetitive justifications for Visa's anti-steering rules.  But for the restraints, Wal-Mart and other merchants could have steered some customers into different payment products and could have negotiated more favorable terms from Visa or from individual Issuers.  As a result, the anti-steering rules, individually and collectively, resulted in anticompetitive effects.

**F.     Visa Monopolized or Attempted to Monopolize the General Purpose Debit Card Services Market.**

94.     Separate from the anticompetitive Interchange Fee price-fixing scheme described above, Visa has also engaged in additional anticompetitive conduct during the Damages Period. The purpose of this conduct has been to give Visa a monopoly in the market for General Purpose Debit Card Network Services.  This conduct has included dedication agreements between Visa and Issuers of Visa General Purpose Debit Cards and the imposition of anticompetitive Network Fees in the General Purpose Debit Card market.

95.     This conduct has enabled Visa to suppress competition in the market for General Purpose Debit Card Network Services, to charge higher Interchange Fees, and to charge higher Network Fees than they otherwise would have been able to charge to Wal-Mart and other merchants.

96.     Visa has monopolized the General Purpose Debit Card market during the Damages Period and continues to do so today.  Through anticompetitive conduct, Visa "essentially lock[ed] up 89% of the volume of its top 100 debit Issuers." *United States v. Visa U.S.A. Inc.*, No. 98-cv-7076(BSJ), 2007 WL 1741885, at *2 (S.D.N.Y. July 15, 2007).  It accomplished this "lock up" through long-term dedication agreements with most of its large Issuers which "prevent[ed] Visa banks from switching to MasterCard" which, at the time, was the only other Signature Debit Card network.  *Id.* at *1.  Those agreements, along with Visa's preexisting base of Visa- and Interlink-branded General Purpose Debit Cards, enabled Visa to maintain its monopoly power even after it was forced to relinquish the tying rule by the antitrust settlements in *Visa Check*.

97.     Visa has also monopolized the PIN Debit Card market during the Damages Period through exclusive or near exclusive deals with Issuers.  Visa's monopoly power in this market

22

caused merchants to suffer effective Interchange Fee increases of an estimated 234% between 1998 and 2006.

98.     Visa's monopoly power has enabled it to dictate price and inhibit competition.

99.     Effective in April, 2012, Visa implemented the Fixed Acquirer Network Fee. The FANF constitutes a substantial price increase on merchants. Many merchants must pay the FANF to access Visa's networks if the merchant accepts any Visa General Purpose Payment Card transactions. In general, merchants may avoid this fee only by dropping acceptance of all Visa products. Merchants subject to the FANF must pay it whether they route transactions over Visa's network or over a competing Debit network. Visa's purpose in enacting the FANF is to lock in Visa debit acceptance and force merchants to route their Debit card transactions through Visa.

100.    Visa enacted the FANF in response to positive reforms enacted by Regulation II, which was intended to promote competition in the marketplace. The anticompetitive effects of the FANF have further strengthened Visa's monopoly power in both the General Purpose Credit Card and General Purpose Debit Card markets.

101.    There are high barriers to entry in both the General Purpose Credit Card and General Purpose Debit Card markets, as evidenced by the fact that there has been no significant new entrant to these markets since the Discover network entered the market for General Purpose Credit Card network services in 1985. The barriers to entry include an inability to gain General Purpose Payment Card issuance by financial institutions as Issuers have no incentive to upset the underpinnings of this conspiracy.

## ANTITRUST INJURY

102.    Wal-Mart has suffered substantial and continuing harm as a direct result of the anticompetitive and monopolistic conduct of Visa and the banks.  Wal-Mart has suffered harm as a direct purchaser of General Purpose Payment Card Network Services in the form of inflated Interchange Fees, the loss of real network competition, and reduced output.  Wal-Mart and its customers have paid billions of dollars in Interchange Fees and Network Fees that were above what could have existed or could have been sustained in a competitive market.

103.    During the Damages Period, Wal-Mart directly paid Interchange Fees to the relevant Issuer for transactions in which Wal-Mart accepted a Visa General Purpose Payment Card as a method of payment.  As a result, Wal-Mart paid – and continues to pay – substantial, unlawful overcharges as a direct result of the price fixing and monopolization set out in this Complaint.

104.    The anticompetitive conduct of Visa and the banks forced Wal-Mart to raise retail prices paid by its customers and/or reduce retail services provided to its customers as a means of offsetting some of the artificially inflated Interchange Fees.  As a result, Wal-Mart's retail sales were below what they would have been otherwise.

105.    All of Wal-Mart's customers, including those who pay for their purchases with cash, bore part of the cost of the inflated Interchange Fees in the form of higher retail prices.

106.    Wal-Mart was further harmed by anti-innovation conduct on the part of Visa and the banks, such as perpetuating the use of the fraud-prone magnetic stripe system in the United States and the continued use of signature authentication despite knowledge that PIN authentication is more secure, a fact Visa has acknowledged repeatedly in the United States and elsewhere.

## RELEVANT MARKETS

107.    Merchants' demand for General Purpose Payment Card Network Services (authorization, clearance, and settlement of transactions for which a merchant accepts a General Purpose Payment Card) stems from consumer demand for using General Purpose Payment Cards to pay for goods and services.  Because consumer demand establishes both a distinct General Purpose Credit Card market as well as a General Purpose Debit Card market, there are corresponding markets, based upon derived merchant demand, for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services.

**A.      The Geographic Market for All Relevant Product Markets Is the United States.**

108.    The geographic market for all relevant product markets was the United States throughout the Damages Period, and that continues to be the case to this day.  Many of Visa's rules regarding General Purpose Credit Card and General Purpose Debit Card transactions applied only to the U.S. market.  Visa also set policies and pricing—including Interchange Fees—separately for the United States from other regions.

**B.      There Are Distinct Markets for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services.**

**1.      General Purpose Credit Card Network Services.**

109.    There were relevant product markets for General Purpose Credit Cards and General Purpose Credit Card Network Services throughout the Damages Period.  The existence of these markets have been confirmed by economic analysis of cross-elasticity of demand, by industry and public recognition, and by recent judicial decisions in cases related to the claims asserted in this Complaint.  These markets continue to be relevant product markets to this day.

110. General Purpose Credit Cards allow a consumer to purchase goods and services by accessing a line of credit extended to the cardholder by the Issuer that issued the card. These cards provided (and still provide) consumers deferred payment and, typically, the opportunity to revolve balances over time. Charge Cards are a subset of General Purpose Credit Cards that require the consumer to pay off the balance owed upon receipt of their statement, usually monthly.

111. From the consumer perspective, there are no close substitutes for General Purpose Credit Cards because other forms of payment do not offer comparable credit facilities. Therefore, General Purpose Credit Cards are better suited for large purchases that a consumer needs to finance over time than are payment methods such as cash, checks, and General Purpose Debit Cards that do not allow deferred payment. This feature is reflected in studies of consumer payment patterns, which show that the average transaction size for General Purpose Credit Card transactions consistently has significantly exceeded the average ticket for General Purpose Debit Card transactions since the mid-1990s.

112. General Purpose Credit Cards have a unique bundle of characteristics that consumers find useful for certain types of transactions, and for which other payment methods are not close substitutes. A market-wide increase in cardholder fees would not cause sufficient decline in usage for the price increase to be unprofitable to Issuers; demand is sufficiently inelastic to establish a market for General Purpose Credit Cards. This was the case throughout the Damages Period.

113. As the court held in *United States v. Visa U.S.A. Inc.*, 163 F. Supp. 2d 322, 336 (S.D.N.Y. 2001), "it is highly unlikely that there would be enough cardholder switching away

26

from credit and charge cards to make any such price increase unprofitable for a hypothetical monopolist of general purpose card products."

114.    General Purpose Credit Cards and Debit Cards are in separate markets.

115.    Interchange Fees for many PIN Debit Cards and Signature Debit Cards have decreased since the Federal Reserve promulgated Regulation II, but General Purpose Credit Card Interchange Fees have not decreased in response to reduced General Purpose Debit Card fees to merchants. The absence of sensitivity of General Purpose Credit Card Interchange Fees to Interchange Fees for General Purpose Debit Cards is strong economic evidence that General Purpose Credit Cards and Debit Cards are not in the same relevant market.

116.    During the Damages Period, Visa has continued to raise General Purpose Credit Card default Interchange Fees, including significant rate increases for Premium Payment Card transactions, and no merchants have stopped accepting Visa General Purpose Credit Card transactions. This shows that Wal-Mart and other merchants continue to believe that a sufficient number of consumers view General Purpose Credit Cards as unique and that merchants must accept them. General Purpose Credit Card Network Services is a well-defined market characterized by an inelasticity of demand and universal recognition by the public, the parties, and the industry as a whole.

## 2.    General Purpose Debit Card Network Services.

117.    There were relevant product markets for General Purpose Debit Cards and General Purpose Debit Card Network Services throughout the Damages Period. These markets consisted of both Signature Debit Cards and PIN Debit Cards.

118.    General Purpose Debit Cards permit consumers to purchase goods and services by directly accessing the consumer's asset account, usually a DDA, commonly referred to as a

checking account. Per the existing Visa operating rules, General Purpose Debit Cards include stored-value cards, such as payroll cards and flexible spending account cards, where funds are pre-loaded into an account associated with the card and the cardholder can only spend up to the amount pre-loaded on the card. Depending on the type of debit transaction, payment is withdrawn from the cardholder's account and transferred to the merchant within one to several days later.

119.    Both PIN Debit Transactions and signature debit transactions offer basically the same functionality to consumers—a means of payment that is widely accepted and provides for an automatic transfer of funds from the cardholder's asset account (usually a checking account) to the merchant's account. While the signature and PIN methods of authentication differentiate the products, consumers tend to view them as close substitutes. In fact, nearly all PIN Debit Cards allow for signature authentication, and likewise nearly all Signature Debit Cards allow for PIN authentication. Merchants' ability to steer cardholders from signature debit transactions to PIN debit transactions confirms this.

120.    General Purpose Debit Cards possess a combination of characteristics that make them particularly well-suited for certain types of transactions. Because payments are deducted in a matter of hours (or a few days at most) from a consumer's DDA, General Purpose Debit Cards are strongly differentiated from General Purpose Credit Cards. Further, many consumers who have debit cards cannot obtain a credit card, or if they can the fees and interest charges associated with it would be very high. Consumers do not consider General Purpose Credit Cards to be an adequate substitute for General Purpose Debit Cards. Consumers tend to use General Purpose Debit Cards for everyday purchases, such as groceries, small household items, and other small value purchases, especially of non-durable goods. Many consumers segment their

purchases and prefer to put these everyday purchases on their General Purpose Debit Cards and use their General Purpose Credit Cards for larger-ticket items that are not consumed on a monthly basis.

121.    General Purpose Debit Cards are safer than carrying cash and do not require that a consumer plan ahead (*e.g.*, by withdrawing cash from a bank account in order to make purchases).  As Visa has acknowledged, General Purpose Debit Cards also are more widely accepted than checks, making them suitable for transactions at many merchants where checks are not an option.  Consumers view General Purpose Debit Cards as superior to cash and checks and, thus, they likely would not switch to cash and checks in response to a small but significant, non-transitory price increase.  Even as the price of PIN Debit Card acceptance increased from a negative price (*i.e.*, merchants were paid to accept debit because it saved banks' check and cash processing costs) to zero (at-par) to the supracompetitive levels of today, merchants did not substitute away from debit because cash and checks also are not reasonably interchangeable with General Purpose Debit Card Network Services.

122.    Merchant demand exists separately for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services.  As noted by the court in *Visa Check*, "[o]verwhelming evidence establishes that merchant demand for credit card [network] services is distinct from merchant demand for debit card [network] services." *In re Visa Check/MasterMoney Antitrust Litigation*, No. 96-cv-5238(JG), 2003 WL 1712568, at *2 (E.D.N.Y. Apr. 1, 2003).  "[D]ebit card [network] services is a well-defined submarket characterized by an inelasticity of demand and universal recognition by the public, the parties, and the industry as a whole." *Id.* at * 7.

**FIRST CLAIM FOR RELIEF**
**Horizontal Price Fixing and Horizontal Agreements Not to Compete**
**in the Market for General Purpose Credit Card Network Services**

123.    Wal-Mart repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

124.    Defendants' restrictive covenants, whereby its member banks entered into agreements not to compete and price-fixing schemes constituted anticompetitive horizontal restraints.

125.    Defendants maintained the conspiracy for Visa General Purpose Credit Card transactions throughout the Damages Period.

126.    This conspiracy anticompetitively increased, and maintained, the Interchange Fees and Network Fees that Wal-Mart paid to Issuers for Visa General Purpose Credit Card transactions, and it imposed additional damages in the form of Network Fees, fines, and fraud losses. These price increases were the products of the agreement among Visa and its owner/member banks that the banks will not compete for merchants' acceptance of Visa transactions.

127.    The price-fixing conspiracy and agreement not to compete were *per se* violations of Section 1 of the Sherman Act, as amended. Even if analyzed under a rule of reason, this conspiracy and agreement not to compete were unreasonable restraints of trade in violation of Section 1. This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

128.    Wal-Mart suffered antitrust injury from these *per se* unlawful and/or unreasonable restraints of trade.

129.    As a result of these violations of Section 1 of the Sherman Act throughout the Damages Period, Wal-Mart was injured in its business and property in an amount to be proven at trial and believed to be in excess of $5,000,000,000 before trebling.

### SECOND CLAIM FOR RELIEF
### Horizontal Price Fixing and Horizontal Agreements Not to Compete
### in the Market for General Purpose Debit Card Network Services

130.    Wal-Mart repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

131.    Defendants' covenants, whereby its member banks entered into agreements not to compete and price-fixing schemes constituted anticompetitive horizontal restraints.

132.    Defendants maintained the conspiracy for Visa General Purpose Debit Card transactions throughout the Damages Period.

133.    This conspiracy anticompetitively increased, and maintained, the Interchange Fees and Network Fees that Wal-Mart paid to Issuers for Visa General Purpose Debit Card transactions, and it imposed additional damages in the form of Network Fees, fines, and fraud losses. These price increases were the products of the agreement among Visa and its owner/member banks that the banks will not compete for merchants' acceptance of Visa transactions.

134.    The price-fixing conspiracy and agreement not to compete were *per se* violations of Section 1 of the Sherman Act, as amended. Even if analyzed under a rule of reason, this conspiracy and agreement not to compete were unreasonable restraints of trade in violation of Section 1. This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

135.    Wal-Mart suffered antitrust injury from these *per se* unlawful and/or unreasonable restraints of trade.

136.    As a result of these violations of Section 1 of the Sherman Act throughout the Damages Period, Wal-Mart was injured in its business and property in an amount to be proven at trial and believed to be in excess of $5,000,000,000 before trebling.

**THIRD CLAIM FOR RELIEF**
**Vertical Price Restraints in the**
**Market for General Purpose Credit Card Network Services**

137.    Wal-Mart repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

138.    Defendants' price-fixing schemes constituted unreasonable and anticompetitive vertical restraints.

139.    Visa entered into an express vertical agreement with each of Visa's member/owner banks, binding all of them to comply with the rules and regulations adopted by Visa, including the default Interchange Fee and Honor All Issuers rules.  In turn, Visa acted as the enforcement agent for its rules and regulations and held issuing and acquiring members responsible for compliance with these rules and regulations. These agreements continued in full effect throughout the Damages Period.

140.    These vertical price restraints imposed Interchange Fees and Network Fees on Wal-Mart for Visa General Purpose Credit Card transactions above what could have been sustained in a competitive market, and it imposed additional damages in the form of Network Fees, fines, and fraud losses. These restraints continued in full effect throughout the Damages Period and constituted unreasonable restraints of trade in violation of Section 1 of the Sherman

Act. This scheme served no legitimate business purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

141. Wal-Mart suffered antitrust injury from these unreasonable restraints of trade.

142. As a result of this violation of Section 1 of the Sherman Act throughout the Damages Period, Wal-Mart was injured in their business and property in an amount to be proven at trial and believed to be in excess of $5,000,000,000 before trebling.

## FOURTH CLAIM FOR RELIEF
### Vertical Price Restraints in the
### Market for General Purpose Debit Card Network Services

143. Wal-Mart repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

144. Defendants' price-fixing schemes constituted unreasonable and anticompetitive vertical restraints.

145. Visa entered into an express vertical agreement with each of Visa's member/owner banks, binding all of them to comply with the rules and regulations adopted by Visa, including the default Interchange Fee and Honor All Issuers rules. In turn, Visa acted as the enforcement agent for its rules and regulations and held issuing and acquiring members responsible for compliance with these rules and regulations. These agreements continued in full effect throughout the Damages Period.

146. These vertical price restraints imposed supracompetitive Interchange Fees and Network Fees on Wal-Mart for Visa General Purpose Debit Card transactions, and it imposed additional damages in the form of Network Fees, fines, and fraud losses. These restraints continued in full effect throughout the Damages Period and constituted unreasonable restraints of trade in violation of Section 1 of the Sherman Act. This scheme served no legitimate business

purpose, and achieved no legitimate efficiency benefit to offset its substantial anticompetitive effects.

147.    Wal-Mart suffered antitrust injury from these unreasonable restraints of trade.

148.    As a result of this violation of Section 1 of the Sherman Act throughout the Damages Period, Wal-Mart was injured in their business and property in an amount to be proven at trial and believed to be in excess of $5,000,000,000 before trebling.

## FIFTH CLAIM FOR RELIEF
### Monopolization of the Market for General Purpose Debit Card Network Services

149.    Wal-Mart repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

150.    Through the anticompetitive acts set forth above, Visa has unlawfully acquired monopoly power in the market for General Purpose Debit Card Network Services. Visa has taken acts that have the effect of giving it power over price and the power to exclude competition in the market for General Purpose Debit Card Network Services.

151.    Through the FANF, Visa has further unlawfully maintained its monopoly power through anticompetitive conduct that had the purpose and effect of excluding competition from and raising the costs of, other providers of General Purpose Debit Card Network Services.

152.    As a direct and proximate result of Visa's exclusionary conduct, Interchange Fees and Network Fees for General Purpose Debit Card Network Services were set at artificial, supracompetitive levels and Wal-Mart suffered injury to its business and property by paying such artificially-inflated, supracompetitive Interchange Fees and Network Fees.  Wal-Mart suffered antitrust injury from these acts of monopolization.

34

153.   Visa's unlawful acquisition of monopoly power constituted a violation of Section 2 of the Sherman Act.  Visa's unlawful maintenance of monopoly constitutes a violation of Section 2 of the Sherman Act, which is ongoing.

**SIXTH CLAIM FOR RELIEF**
**Attempted Monopolization of the Market**
**for General Purpose Debit Card Network Services**

154.   Wal-Mart repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

155.   Visa has taken acts that have the effect of giving Visa power over price and the power to exclude competition in the market for General Purpose Debit Card Network Services.

156.   Visa specifically intended to monopolize the market for General Purpose Debit Card Network Services, as evidenced by Visa's specific intent to obtain power over Interchange Fee and Network Fee pricing for General Purpose Debit Card Network Services, Visa's specific intent to exclude competition in the market for General Purpose Debit Card Network Services, and by Visa's specific intent to take acts with the effects of giving Visa power over price and excluding competition.

157.   To the extent Visa does not already possess monopoly power, there is a dangerous probability that Visa will obtain monopoly power in the market for General Purpose Debit Card Network Services through the FANF.

158.   As a direct and proximate result of Visa's exclusionary conduct, Interchange Fees and Network Fees for General Purpose Debit Card Network Services were set at artificial, supracompetitive levels and Wal-Mart suffered injury to its business and property by paying such artificially-inflated, supracompetitive Interchange Fees.  Wal-Mart suffered antitrust injury from these attempted acts of monopolization.

159.     Visa's attempted monopolization constituted and, through the FANF, continues to constitute a violation of Section 2 of the Sherman Act.

## SEVENTH CLAIM FOR RELIEF
### Conspiracy to Monopolize the Market for General Purpose Debit Card Network Services

160.     Wal-Mart repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

161.     Visa and its member banks colluded and conspired among themselves with the specific intent to monopolize the market for General Purpose Debit Card Network Services.

162.     This conspiracy was successful, as Visa, through the overt acts described above, acquired, enhanced, and maintained monopoly power in the market for General Purpose Debit Card Network Services during the Damages Period.

163.     As a direct and proximate result of Visa's and the banks' conspiracy to monopolize, Interchange Fees for General Purpose Debit Card Network Services were set at artificial, supracompetitive levels and Wal-Mart suffered antitrust injury to its business and property by paying such artificially-inflated, supracompetitive Interchange Fees.

164.     Visa's and the banks' conspiracy to monopolize constituted and, through the FANF, continues to constitute a violation of Section 2 of the Sherman Act.

## EIGHTH CLAIM FOR RELIEF
### Violation of State Antitrust and Unfair Competition Laws

165.     Wal-Mart repeats and realleges each and every allegation contained in the paragraphs above as if fully set forth herein.

166.     As set forth herein, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Alabama Code § 8-10-1 et seq.

167.   As set forth herein, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Arizona Revised Stat. § 44-1401 et seq.

168.   As set forth herein, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of California Bus. & Prof. Code § 16700 et seq. and Cal. Bus. & Prof. Code § 17200 et seq.

169.   As set forth herein, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of District of Columbia Code § 4501 et seq.

170.   As set forth herein, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Florida Stat. Ann. § 501.201 et seq.

171.   As set forth herein, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Hawaii Rev. Stat. § 480-1 et seq.

172.   As set forth herein, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of 740 Illinois Comp. Stat. Ann. § 10/1 et seq.

173.   As set forth herein, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Iowa Code Ann. § 553.1 et seq.

174.   As set forth herein, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Kansas Stat. Ann. § 50-101 et seq.

175.   As set forth herein, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Maine Rev. Stat. Ann. 10, § 1101 et seq.

176.   As set forth herein, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Michigan Comp. Laws Ann. § 445.771 et seq.

177.     As set forth herein, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Minnesota Stat. Ann. § 325D.49 et seq.

178.     As set forth herein, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Mississippi Code Ann. § 75-21- 1 et seq.

179.     As set forth herein, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Nebraska Rev. Stat. § 59-801 et seq.

180.     As set forth herein, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Nevada Rev. Stat. Ann. § 598A.010 et seq.

181.     As set forth herein, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of New Mexico Stat. Ann. § 57-1-1 et seq.

182.     As set forth herein, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of New York General Business Law § 340 et seq. and § 369-A.

183.     As set forth herein, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of North Carolina Gen. Stat. § 75-1 et seq.

184.     As set forth herein, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of North Dakota Cent. Code § 51- 08.1-01 et seq.

185.     As set forth herein, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Oregon Rev. Stat. Ann. § 646.705 et seq.

186.     As set forth herein, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Rhode Island Gen. Laws Ann. § 6-36-1 et seq.

187.     As set forth herein, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of South Dakota Codified Laws Ann. § 37-1 et seq.

188.     As set forth herein, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Tennessee Code Ann. § 47-25-101 et seq.

189.     As set forth herein, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Vermont Stat. Ann. 9 § 2451 et seq.

190.     As set forth herein, Defendants entered into agreements in restraint of trade and/or engaged in anticompetitive practices in violation of Wisconsin Stat. Ann. § 133.01 et seq.

191.     As a direct and proximate result of Defendants' unlawful conduct, Wal-Mart suffered injury to its business and property in each of these states by paying such artificially inflated, supracompetitive Interchange Fees for General Purpose Credit Card Network Services and General Purpose Debit Card Network Services.

### PRAYER FOR RELIEF

Wherefore, Wal-Mart respectfully demands:

A.     that the Court declare, adjudge, and decree that Defendants have committed the violations of law alleged herein;

B.     that the Court award damages sustained by Wal-Mart because of Defendants' misconduct (to the extent that such damages claims are not barred by the release in MDL 1720), in an amount to be proved at trial, to be trebled in accordance with antitrust law, plus interest, including prejudgment interest, attorneys' fees, and costs of suit;

C.     that the Court grant such other relief as it deems just and proper.

## JURY DEMAND

Wal-Mart demands a trial by jury on all issues.


**Dated:** June 13, 2014

**DOWD BENNETT LLP**

By: _____/s/ James F. Bennett_____
James F. Bennett
John D. Comerford
7733 Forsyth Blvd., Suite 1900
St. Louis, Missouri  63105
(314) 889-7300 (telephone)
(314) 863-2111  (facsimile)

**KRAMER LEVIN NAFTALIS & FRANKEL LLP**
Paul H. Schoeman
1177 Avenue of the Americas
New York, NY  10036
Tel:  (212) 715-9100

*Attorneys for Plaintiffs Wal-Mart Stores, Inc., et al.*