UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---------------------------------------------------------- x

| | |
|---|---|
| In re PAYMENT CARD INTERCHANGE FEE AND MERCHANT DISCOUNT ANTITRUST LITIGATION | No. 05-md-1720 (MKB)(JO) |
| | No. 14-md-1720 (MKB)(JO) |
| This Document Relates To: | JOINT STATUS CONFERENCE STATEMENT |
| ALL ACTIONS. | CONFERENCE DATE: OCTOBER 19, 2016 |

---------------------------------------------------------- X

Pursuant to the Court's August 11, 2016 Order, the parties submit this Joint Case Status Report and Proposed Agenda for the Case Management Conference on October 19, 2016.[1]

## I. RECENT DEVELOPMENT

**Defendants' Position.** Defendants believe that the Second Circuit's decision in *United States v. American Express Company*, Docket No. 15-1672 (Sept. 26, 2016) (the "*Amex* Opinion"), significantly affects the actions in MDL 1720. Following a seven-week bench trial, the district court found that Amex had violated section 1 of the Sherman Act and enjoined Amex from enforcing nondiscrimination provisions in its agreements with merchants. The Second Circuit reversed and remanded with instructions to enter judgment in favor of Amex.

The Second Circuit's decision sets forth a framework equally applicable to plaintiffs' antitrust claims here. The decision confirms, among other things, (i) the need to account for two-sided features of the payment-card industry when assessing market definition, market power, and competitive effects; (ii) the significance of expanded card industry output and improved quality

---

[1] The parties are (1) class plaintiffs, (2) defendants; (3) plaintiffs in the individual cases, which include the 7-Eleven plaintiffs; the Target plaintiffs; Home Depot; the Tedeschi, Caseys and Au Energy plaintiffs; the Tavern Hospitality plaintiffs; Hobby Lobby plaintiffs; American Eagle Outfitters, Inc. ("American Eagle") and rue21, inc.; and (4) Objectors-Intervenors Retail & Merchants Objectors.

of card services to cardholders; and (iii) the benefits to both merchants and cardholders that a network's point-of-sale rules may provide. The Second Circuit's decision supports the positions defendants have advocated on those fundamental issues from the outset of this litigation.

The 7-Eleven Plaintiffs and Target plaintiffs have informed defendants that they intend to move to amend their complaints, in part because of the Second Circuit's decision. Defendants expect that putative class plaintiffs also may seek to amend their complaint in light of the Second Circuit's decision, once the issues surrounding class representation are resolved.

**Individual Plaintiffs' Position.** Defendants vastly overstate the importance of the Second Circuit's decision in *American Express* in an attempt, once again, to extend a deposition schedule they have already extended three times. For present purposes, suffice it to say that the competitive effects analysis in that decision is wholly inapposite to this case because the decision centered on American Express's highly differentiated, vertically integrated business model; its need for non-discrimination rules to compete effectively against the dominant networks (*i.e.*, Visa and MasterCard); and the Government's failure to prove market power. To state the obvious: the decision concerned the conduct of *American Express*, not Visa or MasterCard, and the decision provides ample reasons why the analysis of Visa's and MasterCard's market power is far more straightforward. Indeed, the Second Circuit re-affirmed *United States v. Visa*, which like this case (but unlike *American Express*) involved a horizontal restraint on issuer competition that barred issuers' ability to compete in ways that would have benefitted cardholders. Given the similarity between this case and *United States v. Visa*, the vast bulk of the 7-Eleven and Target Plaintiffs' amendments to their complaints involve elaborations, employing the voluminous record from defendants' own admissions, which they are prepared to develop at depositions, of

their longstanding theory of the case, which will show that horizontal restraints on issuer competition for merchants harmed merchants, cardholders, and consumers alike.

Moreover, because defendants have long asserted—since, as they acknowledge, the "outset" of this case—that there is a need to analyze both sides of what they claim is a "two-sided" market, those issues were taken into account when the parties began negotiating the parameters of discovery well over two years ago.

Accordingly, because the *American Express* opinion does not raise any new or unexpected issues affecting on-going discovery in these cases, defendants' attempt to exploit that decision to again delay the beginning of deposition discovery should be rejected.

**Class Plaintiffs' Position.** Class Plaintiffs read the Second Circuit's *Amex* Opinion much differently than do defendants. As the Second Circuit recognized, Amex has a differentiated business model from Visa and MasterCard, which affects the antitrust analysis of the various networks' conduct. (Slip Op. at 37-38.) Amex operates a "closed loop" proprietary system where it directly issues cards and acquires merchant transactions, serving as the "bank" for both customers in its system. By contrast, Visa and MasterCard are "open loop" networks with multiple banks and intermediaries involved in the card issuing side of the platform or the merchant acceptance side of the platform and with Visa or MasterCard serving as the network link in the middle. Visa and MasterCard do not themselves issue payment cards or acquire merchant transactions.

In addition, Visa and MasterCard historically were associations run by thousands of bank owner-members, all of whom are horizontal competitors who collaborated in setting the merchant fees that they paid to each other and in formulating the merchant anti-steering rules that protected them from inter-brand competition. And while the Visa and MasterCard

restructurings divested the banks' outright ownership, Visa and MasterCard continue to function as the designated rate- and rule-setters for their member banks. The structural differences between the two systems are further reflected by the fact that Visa and MasterCard both chose to immediately settle the government's antitrust challenge in 2010, while Amex chose to defend its differentiated model.

Class Plaintiffs believe the panel's decision in the *Amex* Opinion, while in error, is distinguishable as it rests heavily on the differences between Amex's model and the association systems of Visa and MasterCard. Among other conclusions in the *Amex* Opinion, the panel found that "[t]he relevant market in this case is not the same as the relevant market in *Visa* because the two-sided platform at issue here is a single firm operating within the broader 'network services' industry at issue in *Visa*." [Op. at 38]. And the error that the panel found was the district court's failure to address market power and harm to competition in the "two-sided market" that the government alleged–an error which the panel did not find present in the *United States v. Visa* decision. (*Id.* at 36, 39-40.) As the panel noted, the factual findings in *United States v. Visa USA, Inc.*, 344 F.3d 229 (2003), focused on identical exclusionary rules adopted by both the Visa and MasterCard bank associations. The district court in *Visa* found, and the Second Circuit agreed, that credit card transactions "involved two interrelated, but separate, product markets": the market for card issuance, and the market for merchant network services. *Id.* at 238-39. As in *Visa*, Class Plaintiffs in this case assert that the identical default interchange, card acceptance and anti-steering rules, working in tandem, imposed by both Visa and MasterCard amount to "horizontal restraint[s] adopted by 20,00 competitors." *Visa*, 344 F.3d at 242.

With regard to the scheduling concerns raised by defendants, Class Plaintiffs are considering whether they wish to amend their operative complaints in this matter and will advise the other parties and the Court within a reasonable time after the Court's decision on appointment of interim (b)(2) counsel. Class Plaintiffs will be prepared to participate in the anticipated discovery on the schedule that the Court deems appropriate.

**The R&M Group's Position.** The R&M Group agrees with previously appointed class counsel and the Individual Plaintiffs that given the differences in business structures and market power between American Express and Visa/MasterCard (and the fact that Visa and MasterCard entered into consent judgments voluntarily rescinding their anti-steering provisions), the Second Circuit's *Amex* opinion will have limited, if any, direct impact on the antitrust analysis in this action. The R&M group is nevertheless analyzing whether the decision affects the evidence that the (b)(2) class needs to develop in the case, and to that end are in the process of retaining an economist with expertise in two-sided market analysis.

## II. DISCOVERY SCHEDULE

**Defendants' Position.** At the last status conference, the Court and parties targeted December 1, 2016 for the commencement of party and non-party depositions in a coordinated fashion involving both the putative class and individual actions. However, since the status conference the circumstances have changed, and the *Amex* Opinion raises fundamental questions about the nature and viability of plaintiffs' claims. In light of this uncertainty, and the pending class counsel determination, defendants respectfully suggest that the parties meet and confer to discuss the timing of amended complaints, the readiness of class counsel to participate in discovery, the need for any adjustment in the targeted December 1, 2016 start date for

coordinated depositions, and a unified case management schedule accounting for these changed circumstances to be presented to the Court.

*First*, at the last status conference, the Court allowed depositions to commence on December 1, 2016 based on understandings that (i) the 7-Eleven and Target plaintiffs would provide defendants with proposed amended complaints in "short order," 8/11/16 Tr. at 45:18; and (ii) class plaintiffs might propose to amend their complaint in the future, but the amendments would *not* involve new theories. The Court explained, "[t]hat is what I want before the depositions start, any new theories identified, but if we are not looking at that I do not think we have to worry." *Id.* at 46:5-7.

As discussed above, the 7-Eleven and Target plaintiffs provided proposed amended complaints to defendants before the *Amex* Opinion issued, but since have communicated to defendants that they intend to amend their complaints further in light of that ruling. Given the range of issues addressed in the *Amex* Opinion and the implications of that decision for this case, defendants expect that forthcoming proposed complaint amendments — including from the class plaintiffs, once class representation issues are resolved — are likely to be significant in nature and may well present new theories of market definition, market power, and competitive effects.

Without seeing the proposed amendments from all plaintiffs, defendants cannot assess the potential effect of those amendments on case matters and schedules, including whether any of the proposed amendments might be objectionable and give rise to issues that will require disposition by the Court. In any event, defendants believe that, before depositions commence, all parties should discuss a timeline for proposed amended complaints and any responses thereto. If depositions were to proceed in the interim, defendants may face the possibility of having to offer witness testimony without the benefit of plaintiffs' complete allegations, or of the same

witnesses sitting multiple times due to requests for additional depositions based on subsequently-asserted new allegations and theories. Defendants may also be forced to begin taking depositions of plaintiffs' witnesses without a full understanding of plaintiffs' theories.

*Second*, defendants continue to believe that there should be certainty concerning class representation before depositions commence. While the individual plaintiffs have been urging defendants to schedule depositions in December and January, it is not yet known who can speak for the class on scheduling issues and who will represent the putative class plaintiffs at the depositions. It is also uncertain how, if at all, the class representatives will "catch up" by producing discovery from their own files and fit into the deposition protocol and deposition plan that defendants and individual plaintiffs negotiated (over several months) when the class settlement was on appeal. The same would be true for any merchants that file new actions or that choose to join one of the existing actions.

In light of the multiple factors in play now, defendants believe that all parties and the Court would benefit from coordination and efficiency across all the cases. Defendants suggest that all parties — including any newly appointed class counsel — meet and confer to understand the implications of the amended complaints and the appointment of class counsel, and to develop a unified and sensible case management schedule to be presented to the Court. This would allow all of the cases to proceed in a coordinated and orderly fashion, and avoid the risk of needless expense and duplication, all of which reflect the benefits of an MDL proceeding.

**Individual Plaintiffs' Position.** Defendants' request for a new case schedule should be rejected. There is no reason to delay the lengthy deposition program that is finally set to begin on December 1 pursuant to the current case schedule and as discussed at the August status conference.

Implicit in defendants' suggestion that the case schedule be further delayed is the idea that something in the *American Express* decision or the status of class leadership provides the basis for a stay of discovery. But, for the reasons stated above, nothing in the *American Express* decision—grounded in a perceived failure of proof by the Government after a seven-week bench trial—provides the basis for any additional procedural motions, let alone a stay of discovery. Indeed, it was widely anticipated that the *American Express* panel would reverse the district court since December 2015, when the Second Circuit vacated the district court's injunction immediately after oral argument. As with the long pendency of the Second Circuit decision in the class case, defendants never before suggested that the impending decision merited a delay in the discovery schedule. Defendants are simply seizing on this "new development" opportunistically to once again delay the progress of this case.

Contrary to defendants' characterization, December 1 is not a "target date" but, rather, a court-ordered start date pursuant to an agreed-upon case schedule and protocol (*see* 8/11/16 Tr. at 44: 5-6, referring to a "firm December 1 starting date"). As the Court is aware, plaintiffs have been waiting a long time to begin depositions, and defendants have resisted and sought delay at every turn. Despite telling this Court at the last status conference that there were no impediments to beginning the deposition scheduling for December and January (*see* 8/11/16 Tr. at 51:9-16), Visa and MasterCard have to date refused to provide a single date for any of the witnesses on plaintiffs' August 2 deposition list, despite numerous requests by plaintiffs for an exchange of this information.

Defendants suggest that the stated intention of some plaintiffs to amend their complaints means that defendants cannot prepare their witnesses for depositions beginning in December. Yet defendants fail to explain how amendments to the complaint that largely supplement theories

articulated three years ago (related to defenses defendants have long asserted) would change the scope of the testimony that plaintiffs or defendants will give in Rule 30(b)(6) and individual depositions.

In fact, when ordering the December 1 date, the Court recognized that other amendments might be forthcoming once the class counsel leadership issue was resolved. (8/11/16 Tr. at 34:18-22.) The potential for amendment of a complaint is therefore no basis on which to stay depositions, especially when plaintiffs have already waited years for those depositions to commence and depositions will occur over many months. And, as noted, the *American Express* decision does not raise any novel or unexpected legal or factual issues that would require amendment of the Rule 30(b)(6) notices, identification of different individual deponents, or duplication of witnesses.

Defendants also express concern about class counsel's ability to "catch up" and "fit into the deposition protocol and deposition plan," and use this as another reason to suggest a new case schedule. Tellingly, however, none of those who have applied to be class counsel expressed similar concerns. Rather, all of the potential class counsel have represented that they, too, have an interest in moving the case forward expeditiously. In fact, the FCP Group has been part of 7-Eleven Plaintiffs' action until recently and has represented that its members are able to proceed with the prosecution of the class case in line with the work of the individual plaintiffs' groups. (ECF No. 693 at 7, n. 4.) Similarly, previously-appointed class counsel represented that they do not want to delay depositions, and that they believed they will be able to meet the deadlines in the deposition protocol. (8/11/16 Tr. at 46:22-47:11.)

For these reasons, the Target, 7-Eleven, and The Home Depot Plaintiffs believe the current case schedule is appropriate and that depositions should commence on December 1.

Plaintiffs further respectfully request that the Court order the parties to exchange deposition dates for their witnesses promptly following the October 19 status conference, given that Visa and MasterCard previously indicated that they could begin this process in August.

**The R&M Group's Position.** If appointed to represent the (b)(2)/injunctive relief interests of the class, R&M Group Counsel will be prepared to participate fully if the Court is inclined to maintain the current plan of beginning depositions on December 1, 2016. To address Defendants' concerns, the R&M Group would also endeavor to produce documents from the files of the clients it selects to represent the (b)(2)/injunctive relief class as expeditiously as possible and make these class representatives available for deposition.

**Position of the Applicants for Class Counsel.**[2] Briefing on the appointment of class counsel concluded on September 15. The applicants will be prepared to have oral argument on the motions for class leadership at the October 19 conference.

## III. SERVICE OF DOCUMENTS

**Bank Defendants' Position.** The bank defendants in 14-md-1720 (Bank of America, Citi, JPMorgan Chase and Wells Fargo) have recently become aware that the 7-Eleven Plaintiffs and Target plaintiffs have not been copying bank defendants when serving discovery responses, letters, and other papers not filed with the Court. Bank defendants believe that they should be served with copies of such documents in this coordinated action, and have raised this concern with both the 7-Eleven and Target plaintiffs. Bank defendants understand that they have resolved this issue with 7-Eleven plaintiffs. Target plaintiffs have informed bank defendants that

---

[2] This section of the Status Report is submitted on behalf of the following applicants for class counsel: Kaplan Fox & Kilsheimer, LLP; Nussbaum Law Group, P.C.; Kirby McInerny LLP and Goldstein & Russell, P.C.; and the Duncan Firm, the Thrash Law Firm, Parker Waichman, Cuneo, Gilbert & LaDuca, Clifford Law Offices, Robinson Calcagnie, Girard Gibbs and Keller Rohrback, L.L.P.

they are considering the issue. Bank defendants would like this issue to be resolved without Court assistance, but may need to seek Court assistance if it cannot be resolved quickly.

**Target Plaintiffs' Position**. The Target Plaintiffs do not understand the Court's January 29, 2015, order to require that *all* documents be served on *all* parties to every case that is part of the MDL litigation. Rather, the order provides that all parties will use File & ServeXpress for service of all written discovery; it thus dictates only the manner of service, and not the entities on whom service shall be made. The Bank Defendants are not parties to the Target Plaintiffs' case, and the Bank Defendants have not served any discovery requests on the Target Plaintiffs. As a result, the Target Plaintiffs are not aware of any reason that they are required to serve their discovery responses or document production, or correspondence about those topics, on the Bank Defendants, through File & ServeXpress or otherwise. Nevertheless, as noted, the Target Plaintiffs are considering this issue and hope to be able to resolve it shortly without the Court's assistance.

DATED: October 14, 2016.